Donna RODRIGUEZ, Personal Representative of the Estate of Salvador J. Rodriguez, and Marianne Devich, Personal Representative of the Estate of Michelle Devich, Melissa Devich and Randy Rodriguez, Appellants,

v.

John Let AGER, David Ager and Sammons Trucking Company, Inc., a Montana corporation.

No. 81–1261.

United States Court of Appeals, Tenth Circuit.

Jan. 10, 1983.

Michael G. Sawaya, Frye & Sawaya, P.C., Denver, Colo. (Richard B. Rose, Frye & Sawaya, P.C., Denver, Colo., with him on the brief), for appellants.

Richard R. Bostwick, Murane & Bostwick, Casper, Wyo. (David A. Scott, Murane & Bostwick, Casper, Wyo., with him on the brief), for appellees.

Before HOLLOWAY, DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This case involves a collision of a semi-tractor-trailer truck with an automobile which was driven by Salvador Rodriquez. Rodriguez and three of his children and those of Mrs. Devitch, his wife, were killed. It was a head-on collision which resulted from an effort on the part of the truck driver to pass a vehicle on his side of the road. It was going in an opposite direction from Rodriguez' vehicle and as the truck turned out to pass the car on its right it collided head-on with the Rodriguez car, destroying the vehicle and all of its passengers.

The main issue in the case is whether the court erred in not ruling that Sammons Trucking Company, the lessee-carrier of the truck was responsible legally for the injuries suffered. Sammons escaped being held liable in the trial court.

Mrs. Devitch, the wife of Salvador Rodriguez, obtained an award from the jury of $65,036.90 as against the owner and driver of the truck for the death of her husband and the four surviving children, each of whom received an award from the jury of $5,000 for the death of their father. Mrs. Devitch recovered only the funeral expenses for the loss of her three children. No award was made to the surviving children for the loss of their brothers and sisters. Michael de Guzman, the child who survived but was injured in the accident, recovered a judgment in the amount of $11,300. The amounts listed above do not necessarily represent the amounts that have been or will be received by the parties. The named defendants are David Ager, the owner of the equipment, the Sammons Trucking Company, Inc., a Montana corporation, and John Let Ager, the driver of the vehicle.

David Ager had leased the equipment to the Sammons Trucking Company, Inc. At the time in question, the lease was on the verge of being terminated, but at the time of the accident which took place on December 16, 1978 the lease had not been cancelled and the insignia of Sammons, which is essential and must be carried at all times, was on the truck and had not been returned to Sammons Trucking Company. John Ager was driving the truck from Belle Fourche, South Dakota to Casper, Wyoming for the purpose of picking up and hauling a load of wool. The arrangement for the trip had been made the day before by his brother David, the Ager who was then the owner of the truck. The collision occurred near Lusk, Wyoming. The patrolman who investigated it testified at the trial that the defendant's truck crossed the center line of the highway into the decedent's oncoming lane of traffic. This movement to the wrong side of the road produced the accident in which Salvador Rodriguez, the driver, and the three children, Michelle and Melissa Devitch, and Randy Rodriguez, were killed.

The lease was entered into on August 3, 1977. Sammons, a motor carrier licensed by the Interstate Commerce Commission and subject to ICC regulations, was the lessee. This lease allowed David Ager to operate his truck as a carrier in interstate commerce. Sammons was also paid a percentage of the revenue received when a haul was made with the truck. The parties stipulated that at the time of the accident the tractor being driven by John Ager had Sammons' insignia on its side, including decals of Sammons plus the identifying docket number assigned to Sammons by the ICC.

In the latter part of November or early December of 1978 David Ager had notified Sammons that he wished to terminate the lease. On or about December 6th Sammons sent Ager the contract to sign on the occasion of the termination. The written termination form was signed by Ager on December 11, 1978 and later forwarded to Sammons. It was after the accident though that Ager sent all of the issuances, the

authorities and the license plate and the contract back to Sammons. One reason for the termination was that David planned to sell the truck to his brother John who was the driver of it at the time of the accident.

The main thrust of this appeal, as we have indicated, is whether Sammons Trucking Company, Inc., an organization which had been licensed by the Interstate Commerce Commission and thus was governed by its regulations, is responsible as a matter of law for the accident even though the driver was not on a mission of Sammons and even though Sammons was unaware of the fact that the vehicle was being used in the way that it was.

Other issues are whether the damages awarded by the jury were so inadequate, particularly as to the deceased children, considering that only the funeral expenses were awarded, and were influenced by passion and prejudice or some other invalid element which may have invaded the jury's deliberations. A further issue is whether the trial court erred when instructing the jury as to the elements of comparative negligence considered that the defense had not raised it in the pleadings or in the pretrial order. The jury found that Rodriguez was 25% at fault, whereas the truck driver was held to be 75% at fault. The appellant's contention on this issue is that the case is controlled by the ICC regulations which were in effect on the date of the accident. *See* Section 1057 of Title 49 of the Code of Federal Regulations.

## THE I.C.C. REGULATIONS

■ There is no dispute about the nature of the project that Ager was pursuing at the time of the accident. We have mentioned that it was not on behalf of Sammons; rather it was all arranged by John's brother, David, who was then the owner of the truck and hence it cannot be said that John was driving the truck as an agent of Sammons. If this liability exists at all it is by virtue of a regulation of the ICC. This is what has been referred to as Section 1057.4 of the Code of Federal Regulations. It was promulgated by the ICC some years

ago and apparently the promulgation was to correct a problem which existed at the time with respect to regulation of leasing in interstate transportation by truck. For example, one of the provisions of the regulations is that when possession of the equipment is taken by the authorized carrier or the regular employer or agent to do the authorized act for it, said carrier, employee or agent shall give to the owner of the equipment, or the owner's employee, a receipt specifically identifying the equipment and stating the date and the time of day possession thereof is taken. Likewise when the possession by the authorized carrier ends, it or its agent or employee shall obtain from the owner of the equipment, or its regular employee or agent duly authorized to act for it, a receipt specifically identifying the equipment and stating therein the date and time of day possession thereof is taken. Another section which is sub-section (d)(1) provides for identification being removed. It provides as follows:

(1) *Identification to be removed when lease terminated.* The authorized carrier operating equipment under this part shall remove any legend, showing it as the operating carrier, displayed on such equipment, and shall remove any removable device showing it as the operating carrier, before relinquishing possession of the equipment.

There is one other provision which is of particular importance in this case and that is 49 C.F.R. § 1057.4(a)4 which provides:

*Exclusive possession and responsibilities.* Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement.

In this case the jury found and concluded that the lease remained in effect at the time of the accident. Notwithstanding that the trial court held that the trucking company could be held responsible only if respondeat superior or vicarious liability, strictly speaking, was present and the jury was so instructed. The main question which we con-

sider is whether as a matter of law this ruling was wrong under the regulations. Does the regulation provide that Section .4(a)4 result in the lessee of the equipment being absolutely responsible as argued by the appellant. Appellant's position is that the lessee completely assumes responsibility for the equipment and assumes also responsibility for injuries inflicted. Inasmuch as the lease was still in effect the trucking company, it is contended, is responsible until such time as the lease was terminated and after the removal of the insignia of Sammons Trucking Company and delivery of the insignia into the hands of Sammons Trucking Company. At the time of the collision that produced the deaths the Sammons insignia, the authority to drive the truck on the highways, remained on the truck.

Appellants rely completely on the ICC regulations which impose responsibility on the lessee of the truck. These regulations are said to have been promulgated in order to establish responsibility for protection of the public in the lessee of the equipment. The initial important provision is that which requires (1) surrender of the insignia of the lessee and the delivery of a receipt from the owner-lessor showing that the lessor is retaking exclusive possession of the leased equipment and (2) removal from the vehicle of any legend showing that the lessee is the operating carrier that is displayed on the equipment and removal of any other device showing it as the carrier before returning possession of the vehicle to the owner. So, it is argued that Sammons is the lessee if these things have not been carried out and in this instance they have not been.

The House Committee which considered the bill seeking to regulate the lessor-lessee relationship issued a report entitled House Report No. 2425. Among other things, it comments on the necessity for regulation of practices connected with leasing and says that the findings made by the Commission on the basis of which its order was issued, indicate the regulations necessary to deal with practices growing out of the use of leased vehicles by authorized motor carriers, which tend in certain respects to prevent the effective carrying out of certain of the provisions of the Interstate Commerce Act.

The Committee found that in many instances when authorized carriers do lease vehicles owned by others, the safety requirements imposed under Part II of the Act are not observed; that the practice of leasing makes it difficult to fix carrier responsibility; and that some of the arrangements made between authorized carriers and the owners of trip leased vehicles tend to hamper normal rate regulation and otherwise have an adverse effect on the economics and stability of the motor carrier industry. The Committee goes on to say:

> * * * the roles in the Commission's order contain a number of provisions, (such as the requirement that the lease covering a vehicle must be in writing and that a copy must be carried in the vehicle, the lease must specify the compensation to be paid, that the lease must provide for complete assumption by the carrier of *responsibility* for the control and the use of the vehicle during the period of the lease, and so on) which are aimed directly at the abuses alleged to grow out of trip leasing.

Under the heading EXPLANATION OF THE REPORTED BILL is another reference to responsibility of the carrier. It provides in part: "such subsection, (referring to sub-section (f)). The subsection also would authorize the Commission to prescribe such other regulations as may be reasonably necessary to assure that motor carriers will have full direction and control of vehicles while they are being used under such leases, and will be fully responsible for the operation thereof in accordance with applicable law and regulation, as if they were the owners of the vehicles."

## THE APPLICABLE CASE LAW

In the case of *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975), 26 S.Ct.Rptr. 229, the Supreme Court, to be sure in another context, con-

sidered the control and responsibility requirement of the Interstate Commerce Commission's equipment leasing regulation. 49 C.F.R. § 1057.3(a) (1975). The Supreme Court was specifically considering whether an indemnification clause in the contract between the lessor and the lessee was contrary to law. In examining the background the Supreme Court had occasion to comment on the responsibility provision. It said in an opinion by Mr. Justice Blackmun:

> Although one party is required by law to have control and responsibility for conditions of the vehicle and to bear the consequences of any negligence, the party responsible in law to the injured or damaged person may seek indemnity from the party responsible in fact. The indemnification agreement violates the Commission rules only if accompanied by other indicia demonstrating that the lessor was in control of the service provided as well as of the physical operation of the vehicle. But the clause in isolation—as framed by the issue before the district court on the motion for summary judgment, and before the court of appeals and now before us—does not do so.

Thus we have here a situation in which a vehicle is being operated with approval of the lessor when it has an accident. The evidence shows that the lease was still in effect. It had not been terminated.

The Third Circuit case, *Mellon National Bank & Trust Company v. Sophie Lines, Inc.*, 289 F.2d 473 (3rd Cir.1961) held that a licensed interstate carrier which had leased a truck could eliminate its responsibility for the truck's use only by removing all legends, decals or devices showing it as an operating carrier before relinquishing possession and obtaining a proper receipt from the owner. The Third Circuit held that the carrier was responsible for the operation of the truck during the period of the lease even though the truck was being driven by the owner's employee and the owner had undertaken the transportation of lumber for a third party. The carrier had failed at the time to release the truck to the owner or to remove the decals identifying it as a carrier and to obtain a receipt from the owner. Thus the facts of the *Mellon* case are substantially similar to the facts here. Like in our case where the truck did not have an ICC permit, whereas the lessee, Turner Transfer, Inc. did have such an ICC permit and there existed a thirty day lease between Turner and the owner, the Third Circuit said:

> Appellant makes no mention of the Interstate Commerce Commission's strict operational rules or any real suggestion of how their self-evident impact can possibly be avoided. It does insist that its major theme that what happened in the present instance is no different than " * * * where a thief takes a truck from the possession of Turner Transfer, Inc. or Sophie Lines, Inc. and drives it in his own business." Actually there is no true similarity. If it were shown that a thief had stolen the truck while it was being properly operated for Turner under the ICC Rules and thereafter was in an accident with it, of course there would be no conclusive presumption that the truck was on Turner's business. But there was no theft. It was Turner's conduct which allowed the truck to make the trip into Pennsylvania with its decals and its lease.

The Third Circuit cited with approval *Hodges v. Johnson*, 52 F.Supp. 488, 490–91 (D.C.W.D.Va.1943) where the court said there was a comparable situation. *Hodges v. Johnson* recognized the public policy involved and the necessity for holding the lessee responsible. It said:

> Otherwise, the public might be entirely deprived of the safeguards to the public required by the Interstate Commerce Commission, by means of certificate holders evading their responsibility by the employment of irresponsible persons as independent contractors.

The point emphasized was that the ICC regulations are strict operational rules and that their impact is self-evident.

A subsequent case which adopts a similar viewpoint is the Third Circuit decision in *Carolina Casualty Insurance Co. v. Insurance Co. of North America*, 595 F.2d 128 (3rd Cir.1979). There it was said:

In furtherance of the policy of protecting the public and providing it with an identifiable and financially accountable source of compensation for injuries caused by leased tractor-trailers, federal law in effect creates an irrebuttable presumption of an employment relationship between a driver and the lessee whose placards identify the vehicle.

*Id.* at 137, fn. 29.

The Fifth Circuit has ruled similarly, ruling under facts not unlike those before us. The case is *Simmons v. King,* 478 F.2d 857 (5th Cir.1973). Ace Freight Lines, a certified motor common carrier, had entered into a long term lease for the use of a tractor-trailer rig. On the occasion in question the rig was being driven by an employee named King. The rig, with driver, had been leased to Dubose Trucking Co., another certificated carrier, for the purpose of transporting a load of sugar from Reserve, Louisiana to Memphis, Tennessee. The rig, with King driving, rear-ended another tractor-trailer and crushed the driver. The jury returned a verdict against King and Ace, but not Dubose, for the sum of $65,000. The Fifth Circuit, however, reversed the judgment finding in favor of Dubose and did so on the basis of the ICC regulation § 1057.4. It found the regulations to have a supreme controlling effect. King had been attempting to pass the vehicle which was ultimately rear-ended and which was being driven by one Simmons. He reached a flat straight section of a four-lane highway and began trying to pick up speed to pass the Simmons truck. His testimony was that he glanced in his rearview mirror and observed a car approaching to pass him in the left lane so that he was unable to enter the left lane to pass Simmons at the time when he would have been in a position to do so, but he was too late to avoid rear-ending Simmons. The collision was great. It knocked the building materials carried in Simmons' truck, crushing forward the cab of Simmons' truck thereby smashing him between the steering wheel and the cab. The court concluded that the fault was with King. The important aspect for our purpose was that the Fifth Circuit's

opinion of then Chief Judge John R. Brown considered the issue that we have now before us, that is the significance of the ICC Regulation § 1057.4. The reaction of the Fifth Circuit was the finding that the Regulations had a supreme controlling effect. The court explained the reason for the Regulation having been enacted. It said:

> * * * to correct abuses that had arisen under often fly-by-night arrangements with consequent damage to the development and maintenance of a sound transportation system and to the public interest from a helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety.

*Id.* at 866–867. The opinion continues and it explained that the solution to the problem:

> * * * was to impose on the certificated carrier the full responsibility for the entire operation of temporarily leased equipment, whether owner-driver or otherwise.

*Id.* at 867. The court found that the ICC carriers' liability for equipment and drivers covered by leasing arrangements is not governed by the traditional common law doctrine of master-servant relationships and respondeat superior. Instead it ruled that since the lease between Dubose and Ace was in effect and the decals of Dubose were on the truck, Dubose assumed exclusive possession, control and use of the vehicle and responsibility to the public with King as its statutory employee, thereby making Dubose liable as a matter of law for the negligence of King.

There is another decision on this subject. That is the opinion of the Eighth Circuit in *Wellman v. Liberty Mutual Insurance Company,* 496 F.2d 131 (8th Cir.1974). The Eighth Circuit followed the lead of *Mellon, supra.* In *Wellman* Morgan Drive-Away, Inc. (freight division) was a common carrier regulated by the Interstate Commerce Commission and numerous state regulatory agencies and it was a licensed special carrier which hauled or towed trailers, mobile homes and component parts of complete houses. Morgan was found to

own a substantial number of trailers which it used in its operation. In addition, it leased the tractors and trailers to others. On the day in question Morgan and Corrie Mitchell, Jr. entered into an "Equipment Lease" under which Morgan assumed the "possession, control and use" of a tractor-trailer owned and operated by Mitchell. Mitchell was to pay for all of his own expenses on his trips for Morgan, and for the upkeep and maintenance of the equipment, as well as his license plates, tags, stickers, personal property taxes and insurance for when his vehicle was being operated unladen. Mitchell received a portion of the earnings. A Permit Legend of Morgan was placed and displayed on the tractor of Mitchell, and remained on it until the lease was cancelled later. Mitchell proceeded to pick up cargo near Houston, Texas for delivery at Elgin, Illinois. He sought a return load from Morgan's central dispatcher but none was available. (Morgan ordinarily allowed drivers to trip lease). The suit in this case was by a motorist and his wife who were injured in a collision with the truck which was being driven by Mitchell, who had leased the truck to the carrier, much like the case before us. In the suit Morgan was named, as well as others. Morgan notified Liberty Mutual Insurance Company. The question was really whether the insurance company was liable or whether or not Morgan was responsible. The court said:

> It is true that the cases clearly hold that ICC regulations require that the motor carrier operating leased equipment be held liable to the public.

The court observed that Morgan would have been held liable if he had not been dismissed by the plaintiff-appellees. The court said:

> Since there was no judgment of liability against Morgan, the regulations which, on the one hand, require insurance coverage for judgments against the carrier and, on the other, impose legal responsibility upon the motor carrier for the operation of leased vehicles, may not be read into the insurance policy to impose liability upon the insurer of the motor carrier

in contravention of the precise, express terms of the policy.

The court also said, however, that:

> [t]he trial court correctly observed that Mitchell's operation of the truck leased by Morgan—although operated on a journey not specifically authorized by Morgan—would be considered subject to Morgan's control, direction, and authority. So long as the truck carried Morgan's ICC permit as well as that of the Missouri Public Service Commission, Morgan would be liable to third parties injured through the operation of the truck under a theory of vicarious liability derived from the purpose of the Interstate Commerce Act and the language of I.C.C. regulation 49 C.F.R. § 1057.4.

In *Proctor v. Colonial Refrigerated Transportation, Inc.*, 494 F.2d 89 (4th Cir. 1974) it was held that 49 C.F.R. § 1057.-4(a)(4) clearly eliminated the independent contractor concept from lease arrangements and cast upon the carrier full responsibility for the negligence of the driver of the leased vehicle. The carrier argued that its responsibility did not extend to this particular injured party because he was an employee of the lessor, who was a passenger in the truck at the time of the accident. The court refused to follow the independent contractor theory saying that it would undercut the primary purpose of the regulatory design. The court continued:

> The submission of the case to the jury upon this theory was error and requires that the judgment of the district court be set aside and a new trial awarded to the plaintiff. Upon retrial the district court should direct the jury that under the regulations Colonial was responsible for Bales' conduct in operating the equipment, and negligence on his part would require a finding of liability with respect to Colonial.

*Id.* at 92. Several district court decisions support the position taken by the above authorities. *See Cosmopolitan Mutual Insurance Company v. White*, 336 F.Supp. 92 (D.Del.1972). There the court said:

It is clear from the above cases that the ICC carrier's liability for equipment and drivers covered by leasing arrangements is not governed by the traditional common law doctrines of master-servant relationship and respondeat superior.

*Id.* at 99. The ICC placard and lease agreement was recognized by the court as being the equipment's authorization to be on the highway (transporting goods in commerce). When not removed upon cancellation of a lease, it subjects the public to the evils which Congress attempted to eliminate when the independent contractor system was rejected.

*See also Riddle v. Trans-Cold Express, Inc.,* 530 F.Supp. 186 (S.D.Ill.1982) and *Mustang Transportation Company v. Ryder Truck Lines, Inc.,* 523 F.Supp. 1097 (E.D.Pa. 1981).

There is authority to the contrary. *Wilcox v. Transamerican Freight Lines, Inc.,* 371 F.2d 403 (6th Cir.1967), *per curiam, cert. denied,* 387 U.S. 931, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967). In *Wilcox* the facts are quite similar. It was contended by the plaintiffs that absolute liability existed growing out of the ICC regulations. However, the Sixth Circuit, although citing no authorities, rejected this argument holding that Regulations do not impose a liability on a carrier using leased equipment greater than that when operating its own equipment.

*See also* the Seventh Circuit's decision in *Gudgel v. Southern Shippers, Inc.,* 387 F.2d 723 (7th Cir.1967). There again the fact situation was very similar to ours, just as it was in *Wilcox.* The *Gudgel* case is heavily relied on by Sammons in this case. However, the *Gudgel* case, like the other decisions, is not fully reasoned. It flatly took the position that state law governed and superimposed a respondeat superior formula as being applicable to this kind of case. There was not a strong argument made on liability based on the ICC Regulations.

For other examples of cases that simply apply common law doctrine and ignore the ICC policies see *Vance Trucking Co. v. Canal Ins. Co.,* 249 F.Supp. 33 (D.S.C.1966),

*aff'd.,* 395 F.2d 391 (4th Cir.1968), *cert. denied,* 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968). The respondeat superior doctrine which was applied in *Vance* resulted in the plaintiff's recovery. So actually there is no necessity for application of the ICC policy approach.

In summary ICC Regulation approach is applicable. The purpose is a praiseworthy one. It seeks to eliminate fly-by-night contracting by requiring the lessee of a vehicle who permits the equipment to be used on this basis to assure responsibility for the accidents of the driver of the vehicle which displays its insignia. To fail to uphold the ICC Regulations would result in injustice. Trucking equipment such as that here present has a capability for bringing about terrible injuries and damages to life. This is a typical illustration. Here all of the occupants except one child (who was seriously injured) were killed as a result of the truck being on the wrong side of the highway.

■ The contention that it was improper to impose or utilize the comparative negligence doctrine in this instance must be rejected. There was evidence to support the partial submission and the conclusion of fault on the part of the driver Rodriguez.

## CONCLUSION

■ We reject the proposition that the negligence of Salvador Rodriguez was equal to or greater than the negligence of defendant John Ager, the driver of the truck. Ager's action was foolhardy, and this matter was properly considered and determined by the jury, and the jury's result is not palpably wrong.

■ Finally, we consider whether the jury was correct in its finding that Marianne Devitch was only entitled to funeral expenses as damages for the death of her three children. Appellant alleges that these awards are inadequate. Marianne Devitch was shown to be very close to her children. They assisted her in her housework and in running errands and they did many other things. Moreover, she received

no award of damages for the loss of the companionship of her children. This can be attributed only to the jury disregarding the evidence altogether in this connection. A trial court's refusal to grant a new trial on the issue of inadequate damages can be reversed and vacated where as here the jury seemingly disregarded the elements of wrongful death. *See Barnes v. Smith,* 305 F.2d 226 (10th Cir.1962); *Zerr v. Trenkle,* 454 F.2d 1103 (10th Cir.1972). This court, through Judge McWilliams, in *Zerr* said:

> The law on this matter is well settled. The evidence relating to damages should be viewed in a light most favorable to the verdict and the verdict should not be overturned unless it can definitely be said that it is grossly and manifestly inadequate, or unless the amount thereof is so small as to indicate that the jury neglected to take into consideration the evidence as to damages or was influenced by prejudice, passion or other improper considerations.

454 F.2d at 1105.

■ Our conclusion is that the damages awarded for the death of the children, judged by the standards set forth above, are legally inadequate.

Furthermore, we conclude that the court erred in failing to determine as a matter of law the liability of Sammons Trucking Company for the damages suffered. There existed no question of fact as to the liability of Sammons.

It follows that the judgment of the district court must be and is hereby reversed. The cause is remanded for further proceedings.

We have not considered the adequacy of the damage award in the amount of $65,-000.00 plus. This has not been challenged and it will stand.

It is so ordered.