court's imposition of the full panoply of sanctions.

APPEAL DISMISSED; CAUTION ISSUED.

Sarah M. JACKSON and Leo
Smith, Plaintiffs,

v.

Timothy K. O'SHIELDS, J & T Enterprises, Inc., John T. Hanna, and
Larry Wallen, Defendants.

CANAL INSURANCE COMPANY, A
Corporation, Plaintiff–Appellee,

v.

Sarah M. JACKSON, Leo Smith,
Defendants–Appellants.

No. 96–60024.

United States Court of Appeals,
Fifth Circuit.

Dec. 19, 1996.

Brian Atkins Montague, Montague, Pittman & Varnado, Hattiesburg, MS, for Canal Insurance Company, plaintiff-appellee.

David A. Hilleren, Hilleren & Hilleren, Mandeville, LA, for defendants-appellants.

Before HIGGINBOTHAM, DUHÉ and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

The ultimate issue in this appeal is whether Canal Insurance Company ("Canal") has indemnity obligations under an MCS–90 Endorsement issued in connection with the insurance policy of an interstate carrier. To get to the bottom of Canal's indemnity obligations, we must resolve whether a lease

between a tractor owner and carrier that is licensed by the Interstate Commerce Commission ("ICC") can be effectively terminated when the carrier's ICC placard and emblem remain on the tractor and the carrier has not obtained a receipt from the owner-lessor confirming the termination of the lease. We conclude that the presence of a carrier's ICC placard on leased equipment and the carrier's failure to obtain a receipt upon return of the leased equipment do not alone preclude a determination that a lease has been terminated.

I.

On January 31, 1993, a 1976 Freightliner tractor-trailer rig hauling oysters collided with an automobile driven by Sarah Jackson and occupied by Leo Smith. Jackson and Smith allegedly suffered personal injuries as a result of the accident. The tractor-trailer rig was driven by Timothy O'Shields and owned by Larry Wallen. At the time of the accident, the tractor bore the painted ICC placard and the emblem of J & T Enterprises, an ICC-authorized carrier.[1] Canal was J & T Enterprises's insurance company. From there, the matter grew more complicated, as the "round robin of finger pointing by carriers, lessors, owners and drivers, . . . and insurers" began. *Rediehs Express, Inc. v. Maple*, 491 N.E.2d 1006, 1012 (Ind.App. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987).

Jackson and Smith brought suit for personal injuries against O'Shields, Wallen, J & T Enterprises, and John and Theresa Hanna (partners in J & T Enterprises). Canal brought a separate action, seeking a declaration that it had no defense or indemnity obligations to any of the parties in the suit brought by Jackson and Smith. The district court consolidated the underlying tort suit and Canal's declaratory judgment action and bifurcated the matters for trial purposes.

Following a bench trial of Canal's declaratory judgment action, the district court held that there was no lease between J & T Enterprises and Wallen (the owner of the

---

1. J & T Enterprises held an ICC permit authorizing it to transport goods in interstate commerce.

tractor), oral or otherwise, in effect for the trip involved in this case. The district court found that the Hannas (acting as partners of J & T Enterprises) had terminated the written lease and made reasonable efforts both to remove J & T Enterprises's ICC placard and insignia from the tractor and to obtain a cancellation receipt from Wallen. Consequently, the district court rendered a declaratory judgment that Canal, as J & T Enterprises's insurer, has no indemnity obligation to any of the parties to the underlying lawsuit. This appeal followed.[2]

## II.

J & T Enterprises's insurance policy with Canal contained an MSC–90 Endorsement ("Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980").[3] Under the Endorsement, Canal undertook to pay any final judgment rendered against J & T Enterprises arising out of the "operation, maintenance or use of motor vehicles subject to financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980." This provision covered J & T Enterprises's liability arising out of equipment leased by J & T Enterprises and operated under its ICC authority. In this case, whether Canal has any indemnity obligation under the MCS–90 Endorsement turns upon whether there was a lease between J & T Enterprises and Wallen for the 1976 Freightliner at the time of the accident. If there was such a lease, J & T Enterprises would be liable for injuries negligently inflicted by the driver of the truck and, in turn, Canal would have indemnity obligations.

There is no question that from September 3, 1992 to October 30, 1992, J & T Enterprises and Wallen were parties to a Lease Purchase Agreement and a Contractor Operating Agreement with respect to the 1976 Freightliner involved in the accident. As its name suggests, the Lease–Purchase Agreement focused on the terms of J & T Enterprises's eventual purchase of the 1976 Freightliner and contained a warranty of title. The Contractor Operating Agreement, by contrast, provided the nitty-gritty terms of the leasing arrangement between J & T Enterprises and Wallen. Soon after entering into the agreements, however, the Hannas, partners in J & T Enterprises, discovered that expensive repairs and insurance costs made the arrangement infeasible.

The district court found that John Hanna promptly took formal steps to cancel the Lease Purchase Agreement and the Contractor Operating Agreement on behalf of J & T Enterprises. On October 30, 1992, Hanna personally delivered to Wallen a signed and notarized termination notice. At that time, Wallen had already retaken possession and control of the tractor. Wallen refused to sign the cancellation receipt at the bottom of the termination notice. Approximately a week later, Hanna repeated his request that Wallen sign a receipt. Again, Wallen refused to do so. John Hanna also repeatedly asked Wallen to remove J & T Enterprises's painted ICC placard and its emblem from the side of Wallen's 1976 Freightliner. Although Wallen agreed on several occasions to "take care of" removing the painted J & T Enterprises placard from the tractor, he never did so.

Smith and Jackson contend that the lease relationship nevertheless continued in effect through the date of the accident because J & T Enterprises's emblem and ICC placard were not removed from the door of Wallen's truck and because J & T Enterprises did not obtain a receipt from Wallen showing that the lease had been terminated. They also contend that trips undertaken jointly by J &

---

**2.** The district court certified the declaratory judgment portion of the consolidated cases for appeal under Federal Rule of Civil Procedure 54(b). Although the certification was given after the notice of appeal had already been filed, we nonetheless retain jurisdiction to review this case under the rationale expressed in *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 771 F.2d 915, 916 (5th Cir.1985) (citing *Alcorn County, Miss. v. U.S. Interstate Supplies*, 731 F.2d 1160 (5th Cir.1984)

(citing *Jetco Elec. Indus., Inc. v. Gardiner*, 473 F.2d 1228 (5th Cir.1973))). Additionally, we find, and indeed there is no dispute, that the prerequisites for the certification of the interlocutory order have been satisfied. *See* Fed.R.Civ.P. 54(b).

**3.** The exact form of this endorsement is mandated by ICC regulation. *See* 49 C.F.R. § 387.15.

T Enterprises and Wallen after J & T Enterprises gave written notice of termination breathed new life into the otherwise-terminated Contractor Operating Agreement. Alternatively, they argue that joint hauls after the termination of the written lease evidenced an oral lease that was in effect when the accident happened.

### III.

Under the authority of 49 U.S.C. § 11107, the Interstate Commerce Commission regulates leases of equipment used in interstate commerce. *See* 49 C.F.R. § 1057.1 *et seq.* One of the primary purposes of the ICC's leasing regulations is to ensure that carrier-lessees take control of and responsibility for leased equipment during the term of a lease.[4] In line with this purpose, we held in *Simmons v. King* that if there is an existing lease between an ICC-authorized carrier and an owner of leased equipment and the equipment bears the carrier's ICC placard, then the driver of the equipment will be deemed to be the carrier's statutory employee. 478 F.2d 857, 867 (5th Cir.1973). Consequently, the carrier will be held vicariously liable for injuries resulting from the use of the leased equipment. *Id.; Price v. Westmoreland,* 727 F.2d 494, 497 (5th Cir. 1984) (applying *Simmons* ). Other jurisdictions have also employed a "statutory employee" analysis to impose liability on carrier-lessees. *See, e.g., Planet Ins. Co. v. Transport Indemnity Co.,* 823 F.2d 285, 288

(9th Cir.1987); *Rodriguez v. Ager,* 705 F.2d 1229, 1233–36 (10th Cir.1983); *Grinnell Mut. Reinsurance Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400, 1404 (8th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473, 476–77 (3d Cir.1961); *Cosmopolitan Mut. Ins. Co. v. White,* 336 F.Supp. 92, 96 (D.Del. 1972).

This case is not squarely governed by *Simmons,* however, because in *Simmons* there was no doubt that there was a lease in effect between the equipment owner and the ICC-authorized carrier when the accident occurred. Here, the central issue is whether there was a lease between J & T Enterprises and Wallen for the tractor at the time the accident occurred.

Jackson and Smith rely on decisions from other circuits, in which courts have held that a lease can be effectively terminated only if the carrier-lessee (1) removes its identifying placard from the leased equipment, and (2) obtains a cancellation receipt from the equipment owner.[5] These courts relied on a then-existing ICC regulation that placed the burden on the carrier-lessee, upon the termination of a lease, to remove its ICC placard and any identifying emblem or insignia and required the carrier-lessee to obtain a receipt from the owner-lessor.[6]

In 1986, the ICC regulations were substantially modified, giving the leasing parties a much broader range of discretion as to the

---

4. The ICC regulations mandate that, under an ICC-regulated lease, the ICC carrier-lessee assume "exclusive possession, control, and use of the equipment for the duration of the lease" and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c)(1).

5. Under these "logo liability" cases, the presence of a carrier's ICC placard on leased equipment in effect creates an irrebuttable presumption that a lease continues in effect. *See Rodriguez,* 705 F.2d at 1236 ("When [an ICC placard is] not removed upon cancellation of a lease, it subjects the public to the evils which Congress attempted to eliminate when the independent contractor system was rejected."); *Cosmopolitan Mut. Ins. Co.,* 336 F.Supp. at 96 ("Obtaining a receipt for the return of the vehicle and removing the ICC placard are prerequisites to termination of an ICC lease."); *see also Mellon,* 289 F.2d at 476

(explaining that the lessee "could have effectually eliminated its responsibility for the truck's use in only one way," by removing the ICC placard and obtaining a receipt); *Kreider Truck Serv., Inc. v. Augustine,* 76 Ill.2d 535, 31 Ill.Dec. 802, 394 N.E.2d 1179, 1182 (1979) (holding that a carrier's "complete [r]esponsibility" for leased equipment continues until the carrier removes its ICC placard and obtains a receipt).

6. When the ICC regulations were renumbered and republished in 1967, the receipt and placard removal regulations were set out at 32 Fed.Reg. 20,056, 20057–58 (1967), in essentially the same form in which they existed up until the 1986 amendments discussed below. *See* Republication and Redesignation of Regulations, 32 Fed. Reg. 20,003 (1967) (redesignating the ICC leasing regulations, which were previously codified at 49 C.F.R. part 307, as 49 C.F.R. part 1057).

terms of the lease.[7] Significantly, the regulations no longer obligate the carrier to remove identifying placards or other insignia from the leased equipment. Instead, the parties must specify in the lease whether the carrier-lessee or the owner-lessor has this responsibility.[8] Likewise, the regulations now allow the leasing parties to agree whether a receipt will be required upon termination of the lease rather than requiring that the carrier obtain a receipt.[9]

The history of the amendments reflects that they were prompted by the Interstate Carrier Conference's concern (expressed in a petition to the Interstate Commerce Commission) that carriers could face tort liability even if "equipment owners ... wrongfully continue to display the carrier's identification devices on equipment after a lease contract has terminated." 3 I.C.C.2d at 92; *see also Williamson v. Steco Sales, Inc.*, 191 Wis.2d 608, 530 N.W.2d 412, 418–19 (App.1995) (discussing the amendment of the ICC placard removal regulation), *review denied*, 537 N.W.2d 571 (Wis.1995). In enacting the amendments, the ICC made clear that ICC "leasing rules do not and are not intended either to assign liability based on the existence of placards or to interfere with otherwise applicable State law." 3 I.C.C.2d at 93.[10]

In the aftermath of the ICC amendments, the continued vitality of decisions in other circuits holding that a lease cannot be effectively terminated until a carrier removes its placard and obtains a receipt is at best questionable. Even if those decisions could survive the amendments, we decline to hold that the lease between Wallen and J & T Enterprises continued in effect despite J & T Enterprises's conscientious efforts to terminate the lease. Notably, none of the pre-amendment cases cited by Jackson and Smith involved a carrier who conscientiously attempted to remove its placard and to obtain a receipt. *Rodriguez*, 705 F.2d at 1230–31; *Mellon*, 289 F.2d at 477; *Cosmopolitan Mut. Ins. Co.*, 336 F.Supp. at 97 ("The record does not indicate a single effort on McCormick's part to comply with its ICC obligations."). In fact, in both *Rodriguez v. Ager* and *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.*, the underlying leases between the carriers and the equipment owners were apparently still in effect at the time of the accidents. *See Rodriguez*, 705 F.2d at 1230 ("[T]he lease was on the verge of being terminated, but at the time of the accident ... the lease had not been cancelled...."); *Mellon*, 289 F.2d at 475 (noting that the "collision occurred October 4, 1955, within the period of the [30-day] lease").

When faced with a case in which a carrier had assiduously attempted to cancel a lease in accordance with the lease's provisions, a Florida court held in *Atlantic Truck Lines, Inc. v. Kersey*, that the presence of an ICC placard and lack of a receipt are not alone dispositive of the existence of a lease. 387 So.2d 411, 416 (Fla.App.1980), *review denied*, 397 So.2d 778 (Fla.1981). As the Florida court explained, cases like *Rodriguez* and *Mellon* could produce unjust results if applied to a diligent carrier:

7. The amended regulations were in effect when the accident happened and when J & T Enterprises entered into the lease for the 1976 Freightliner. The amendments became effective on November 21, 1986. *See* Lease and Interchange of Vehicles (Identification Devices) (Ex Parte No. MC–43) (Sub–No. 16), 3 I.C.C.2d 92 (October 10, 1986).

8. Section 1057.12(e) provides in pertinent part: ... The lease shall clearly specify which party is responsible for removing identification devices from the equipment upon the termination of the lease and when and how these devices, other than those painted directly on the equipment, will be returned to the carrier.... 49 C.F.R. § 1057.12(e). The regulations as amended still require the authorized carrier to identify leased equipment by displaying its name and MC number on the equipment. 49 C.F.R. §§ 1057.11(c)(1), 1058.2. The control-and-responsibility provisions were also left intact. 49 C.F.R. § 1057.12(c).

9. The regulations provide in relevant part that:

The lease shall clearly specify the manner in which a receipt will be given to the authorized carrier by the equipment owner when the latter retakes possession of the equipment upon termination of the lease agreement, if a receipt is required at all by the lease....
49 C.F.R. § 1057.12(e).

10. In amending the receipt requirement, the Commission noted that the former rule placed "an unrealistic burden on most carriers and offer[ed] no flexibility to the lease parties." *Id.*

[A] lease could be terminated by a carrier because the owner breaches the agreement by never appearing to pick up a designated load, yet despite its best efforts to locate the truck or its owner, the carrier would still be liable as a matter of law if it failed to obtain the placard and receipt. Such a result would offend even the most cynical, and we do not think that it was intended by Congress.

*Id.*[11] Although the facts of the present case are not as stark as those presented in the *Kersey* court's hypothetical, we believe the basic point is sound and applicable in this case.

The district court's findings reflect that the Hannas, partners in J & T Enterprises, terminated the lease in compliance with its terms and took reasonable steps to remove their ICC placard and to obtain a receipt from Wallen. On October 30, 1992, John Hanna presented Wallen with a written and notarized termination notice. Wallen twice refused to sign the termination notice to acknowledge receipt of the equipment. We decline to hold that Wallen's unilateral refusal to sign a receipt extended the term of the Contractor Operating Agreement. Under the agreement's termination clause, either party could terminate the agreement by giving the other a written notice.[12] An acknowledgment of the termination notice is not a condition precedent to termination of the agreement. Nor do the ICC regulations create a presumption that failure to obtain a written receipt vitiates an unequivocal written termination. To the contrary, as we have previously discussed, the regulations now provide that whether a receipt is required *at all* is a matter of contract between the parties.

The presence of J & T Enterprises's ICC placard does not vitiate the otherwise valid termination notice. Under the agreement, Wallen, not the Hannas, bore the responsibility of removing J & T Enterprises's ICC placard and emblem upon the termination of the lease.[13] The district court found that, despite repeated requests by John Hanna, Wallen refused to remove J & T Enterprises's placard from the tractor. Wallen's failure to comply with his obligation under the Contractor Operating Agreement will not be held against J & T Enterprises.

We hold that the presence of J & T Enterprises's ICC placard on the 1976 Freightliner and the lack of a termination receipt did not alone keep the otherwise-terminated agreement alive.

## IV.

Jackson and Smith next contend that J & T Enterprises's and Wallen's periodic joint ventures after the termination of the written lease support imposing vicarious liability on J & T Enterprises for the injuries suffered by Jackson and Smith. During the months following the termination notice, Wallen's 1976 Freightliner was used to pull J & T Enterprises's trailers on various hauls. These joint hauls, Jackson and Smith allege, somehow vitiated J & T Enterprises's written notice terminating the Contractor Operating Agreement. They argue alternatively that the joint hauls created a new lease or leases between Wallen and J & T Enterprises that were in effect when the accident occurred.

The district court found that the hauls after October 30, 1992 were not a continuation of the Contractor Operating Agreement. We agree. As the district court explained, the terms of the later hauls were "substantially and materially different from the long since cancelled contractor operating agreement." For example, under the Contractor Operating Agreement, the parties agreed to a 90–10% revenue split, compared to an agreed 50–50% split for later loads. Further, although the Contractor Operating Agreement by its terms did not apply to tractor-only hauls (those involving a J & T

---

**11.** Even the *Rodriguez* and *Mellon* courts would apparently provide an exception to the logo liability rule if an accident occurred after leased equipment was stolen. *Mellon*, 289 F.2d at 477, *quoted in Rodriguez*, 705 F.2d at 1233.

**12.** Under the agreement, a termination notice is effective upon receipt unless the notice itself states another termination date.

**13.** This provision complied with the ICC regulations as amended. *See* 49 C.F.R. § 1057.12(e).

trailer rather than a Wallen trailer), all the joint hauls after October 30, 1992 were tractor-only hauls. On the whole, the facts as found by the district court do not support Jackson's and Smith's theory that the Contractor Operating Agreement continued after the written termination notice.

Jackson and Smith are no doubt correct that the fact that no written lease was in effect at the time of the accident does not foreclose the possibility that an oral lease existed between the parties. *See Zamalloa v. Hart,* 31 F.3d 911, 917 (9th Cir.1994) (holding that a statutory employment relationship between a driver and a carrier "can be formed via an oral lease between the carrier and vehicle owner even before the driver picks up the cargo"); *Williamson,* 530 N.W.2d at 416 ("Although ICC regulations require the carrier to have a written lease, the failure to have one does not absolve the carrier of liability if an oral lease exists.") (citation omitted). But the district court found that no oral lease between J & T Enterprises and Wallen governed the fateful oyster haul, and the record supports the district court's conclusion. J & T Enterprises was in no way connected to Wallen's haul of oysters on the night the accident occurred. The haul was coordinated exclusively by Wallen. Sam Styron, a broker who arranged the oyster haul at Wallen's request, testified that Wallen told him that he would be hauling the oysters on behalf of Larry's Express. Unlike the previous hauls undertaken jointly by J & T Enterprises and Wallen, which were "tractor only," both the tractor and the trailer involved in the accident belonged to Wallen. The oyster haul did not benefit the Hannas or J & T Enterprises in any way. The trailer carried oysters; the Hannas dealt only in produce. The district court's findings reflect that the Hannas had no knowledge of the haul until days later.[14] Although the driver O'Shields had previously driven trucks on various hauls for J & T Enterprises and Wallen, the district court found that on the occasion in question O'Shields was acting on behalf of Wallen alone. Thus, we conclude that the district court did not err in determining that no oral lease was in effect for the haul in question.

Our holding in *Price v. Westmoreland* does not compel a contrary conclusion. In that case, we held that a carrier-lessee was vicariously liable for injuries to a passenger in a leased truck even though the driver of a truck leased by the carrier did not have permission to carry passengers and the carrier had no knowledge of the passenger's presence. 727 F.2d at 495. There was no question in *Price,* however, that a lease existed between the truck owner and the ICC-authorized carrier. *Id.* Under *Price* and *Simmons,* if the Wallen's truck had been the subject of a lease by J & T Enterprises at the time of the accident, J & T Enterprises would be liable for Jackson's and Smith's injuries regardless of whether the particular trip was on J & T Enterprises's behalf. As the district court found, however, there was no lease in place to connect J & T Enterprises to the truck.

As Jackson and Smith point out, the regulations require leases between an ICC-authorized carrier and an equipment owner to be in writing and require that the lease specify its duration.[15] 49 C.F.R. § 1057.11(a), § 1057.12(b). The leases governing joint hauls undertaken by J & T Enterprises and Wallen after the termination of the written Contractor Operating Agreement did not comply with either of these requirements. We recognize that failure to comply with ICC regulations does not and should not insulate a carrier-lessee from liability. But even if J & T Enterprises had complied fully with ICC

---

14. The district court explained that although the record reflects "some documentary evidence" that J & T Enterprises was the carrier for the load, that evidence stemmed from the presence of the placard and information mistakenly provided by the driver O'Shields. O'Shields testified at the time of trial that he was about the business of Larry Wallen on the day in question, not J & T Enterprises.

15. Jackson and Smith also argue that the regulations require that a lease between a carrier and an owner be for a minimum of 30 days. The regulations as amended, however, clearly allow leases of less than 30 days. 49 C.F.R. § 1057.42; 49 Fed.Reg. 47,850 (Dec. 7, 1984); *see* Elimination of Thirty Day Leasing Requirement (49 C.F.R. § 1057) (Ex Parte No. MC–43 (Sub–No. 15)), 133 M.C. 392 (November 1984).

regulations, this particular trip would not have been within the scope of any lease between J & T Enterprises and Wallen. The district court found that the hauls after October 30, 1992 were "limited specific joint ventures," which did not include the haul in question. Under the district court's findings, which were supported by the evidence, whatever the duration of the lease or leases entered into after the termination of the written agreement, they did not encompass the trip in question. Although operating without a written agreement may violate the ICC's regulations and justify regulatory action against J & T Enterprises, it does not provide a basis upon which to impose vicarious liability on J & T Enterprises in this case.[16]

## V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**16.** Since we have decided that the district court did not err in its determination that there was no lease between J & T Enterprises and Wallen covering the trip in question, we need not reach Canal's additional argument that no liability would attach because the commodity being hauled on this particular occasion (oysters) was exempt from ICC regulation.