IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

SWANSON HAY COMPANY,                    )
                                        )    No. 34566-1-III
            Appellant,                  )    (consolidated with
                                        )    No. 34567-0-III,
    v.                                  )    No. 34568-8-III)
                                        )
STATE OF WASHINGTON                     )
EMPLOYMENT SECURITY                     )    PUBLISHED OPINION
DEPARTMENT,                             )
                                        )
            Respondent.                 )
                                        )
_____ )
                                        )
HATFIELD ENTERPRIZES, INC., a           )
Washington corporation,                 )
                                        )
            Appellant,                  )
                                        )
    v.                                  )
                                        )
STATE OF WASHINGTON                     )
EMPLOYMENT SECURITY                     )
DEPARTMENT,                             )
                                        )
            Respondent.                 )
                                        )
_____ )
                                        )

SYSTEM-TWT TRANSPORT, a
Washington corporation,

       Appellant,

    v.

STATE OF WASHINGTON
EMPLOYMENT SECURITY
DEPARTMENT,

       Respondent.

SIDDOWAY, J. — The common law, the Washington legislature, and the United States Congress have defined whether two parties stand in an employment as opposed to an independent contractor relationship in different ways, depending on the context. This case illustrates that it can be clearer to ask not whether someone is an independent contractor, but to ask instead whether the contractor is independent for a given purpose: e.g., for the purpose of the doctrine of respondeat superior, for federal payroll tax purposes, for state worker's compensation, or for other state law purposes. At issue here is employment security—the context in which, in Washington, the relationship is more likely than any other to be viewed as employment.

The three motor carriers in this consolidated appeal challenge assessments of unemployment insurance taxes on amounts they paid for services provided by "owner-operators," meaning individuals who own trucking equipment, lease it to a carrier, and then use that equipment under contract to haul freight for that carrier. The carriers did

2

not meet their burden of demonstrating that the owner-operators' services qualify for the narrow exemption from unemployment insurance tax liability for payments to sufficiently independent enterprises. We find no federal preemption of the tax's application to the owner-operators' services and no basis on which the agency's final order was arbitrary or capricious. We affirm.

## BACKGROUND

### *Washington's Employment Security Act*

Title IX of the Social Security Act of 1935 for the first time imposed a federal excise tax on employers on wages paid, for the purpose of creating an unemployment benefit fund. *Steward Machine Co. v. Davis*, 301 U.S. 548, 574, 57 S. Ct. 883, 81 L. Ed. 1279 (1937). The tax began with the year 1936 and was payable for the first time on January 31, 1937. *Id.* An employer could claim a 90 percent credit against the tax for contributions paid to an unemployment fund under a state law, provided the state law had been certified to the United States Secretary of the Treasury as meeting criteria designed in part "to give assurance that the state unemployment compensation law [is] one in substance as well as name." *Id.* at 575. The tax and largely offsetting credit were described by supporters as "the states and the nation joining in a coöperative endeavor to avert a common evil": the problem of unemployment that the nation had suffered at unprecedented levels during the years 1929 to 1936. *Id.* at 587, 586.

3

Before Congress considered adoption of the act, most states held back from adopting state unemployment compensation laws despite the ravages of the Great Depression. *Id.* at 588. This was not for "lack of sympathetic interest," but "through alarm lest in laying such a toll upon their industries, they would place themselves in a position of economic disadvantage as compared with neighbors or competitors." *Id.* "The federal Act, from the nature of its ninety per cent credit device, [was] obviously an invitation to the states to enter the field of unemployment insurance." *Standard Dredging Corp. v. Murphy*, 319 U.S. 306, 310, 63 S. Ct. 1067, 87 L. Ed. 1416 (1943) (citing *Buckstaff Bath House Co. v. McKinley*, 308 U.S. 358, 363, 60 S. Ct. 279, 84 L. Ed. 322 (1939)). Most states accepted the invitation and adopted state unemployment compensation laws. *See* Benjamin S. Asia, *Employment Relation: Common-Law Concept and Legislative Definition*, 55 YALE L. J. 76, 83-85, nn.24-34 (1945) (discussing laws adopted by 31 states and the District of Columbia).

Criteria by which the Social Security Board would certify state laws were limited to what was "basic and essential" to provide reasonable protection to the unemployed, with "[a] wide range of judgment . . . given to the several states as to the particular type of statute to be spread upon their books." *Steward*, 301 U.S. at 593. But to assist state legislatures, the Social Security Board published draft laws in 1936 and 1937 as examples

4

meeting the federal requirements.[1] Following a recommendation by the Committee on

Legal Affairs of the Interstate Conference of Unemployment Compensation Agencies

that "employment" for purposes of the state laws should be broadly defined, using a

pioneering 1935 Wisconsin law as a model, a draft bill published by the Social Security

Board in January 1937 tracked Wisconsin's expansive definition of employment. Asia,

*supra* at 83, n.21. It broadly defined employment to mean "service, including service in

interstate commerce, performed for wages or under any contract of hire, written or oral,

express or implied . . . ." *Draft Bill*, 1937 ed., § 2(i)(1) at 7. To narrowly exempt

payments to individuals engaged in an independent enterprise, it employed a three-part

measure of independence, often referred to as the "ABC" definition, that included a

---

[1] Introductory language to the draft bills explained:

These drafts are merely suggestive and are intended to present some of
the various alternatives that may be considered in the drafting of State
unemployment compensation acts. Therefore, they cannot properly be
termed "model" bills or even recommended bills. This is in keeping with
the policy of the Social Security Board of recognizing that it is the final
responsibility and the right of each State to determine for itself just what
type of legislation it desires and how it shall be drafted.

U.S. Soc. Sec. Bd., Draft Bills for State Unemployment Compensation of
Pooled Fund and Employer Reserve Account Types, at i (Sept. 1936) (*Draft Bills*,
1936 ed.), https://babel.hathitrust.org/cgi/pt?id=mdp.39015073775531;view=1up;seq=9;
*see also* U.S. Soc. Sec. Bd., Draft Bill for State Unemployment Compensation
of Pooled Fund Type: January 1937 Edition, with Tentative Revisions (May
1938) (*Draft Bill*, 1937 ed.), https://babel.hathitrust.org/cgi/pt?id=coo
.31924002220212;view=1up;seq=9. As to the latter publication, only the version marked
for tentative revisions could be located by this author.

freedom from control ("A") requirement, an independent business character or location ("B") requirement, and an independently established enterprise ("C") requirement. The "C" requirement was described as "at once the most radical departure from common-law criteria and the most relevant of the three tests to the purposes of the unemployment compensation program." Asia, *supra* at 87.

In March 1937, the Washington Legislature enacted an unemployment compensation act substantially based on the Social Security Board's draft bills, to take effect immediately. LAWS OF 1937, ch. 162 § 24, at 617. Tracking language in the draft bills, its preamble described "economic insecurity due to unemployment" as the "greatest hazard of our economic life." *Id.*, § 2, at 574, presently codified at RCW 50.01.010. It authorized taxation to create resources from which to provide benefits for persons "unemployed through no fault of their own" by applying "the insurance principle of sharing the risks, and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment." *Id.* at 575.

Section 19(g)(1) of the 1937 Washington legislation tracked Wisconsin's and the Social Security Board's definition of employment. Its "ABC" definition of exempt independent enterprises, which was virtually identical to the Social Security Board's 1937 draft bill,[2] provided:

---

[2] Apart from a few formatting differences, the only changes from the federal draft language in the Washington exemption provision were the substitution of "remuneration"

6

Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the director that:

(i)     Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(ii)    Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

(iii)   Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service.

LAWS OF 1937, ch. 162, § 19(g)(5). As later observed by our Supreme Court, because the requirements were stated in the conjunctive, a failure to satisfy any one of them rendered the exemption unavailable. *Penick v. Emp't Sec. Dep't*, 82 Wn. App. 30, 42, 917 P.2d 136 (1996).

In 1945, the Washington legislature repealed all acts relating to unemployment compensation and enacted a new unemployment compensation act, presently codified as amended in Title 50 RCW. LAWS OF 1945, ch. 35 §§ 1-192, at 76-151. The breadth of

---

for "wages" in the introductory paragraph and, in the "ABC" paragraphs ((i), (ii), (iii) in Washington until 1945, when they became (a), (b), (c)); the substitution of "director" for "commissioner"; and the addition to the "C" requirement of the language that the individual's independently established trade, occupation, profession, or business is "of the same nature as that involved in the contract of service." *Compare* LAWS OF 1945, ch. 35, § 15, *with Draft Bill*, 1937 ed., at § 2(i)(5), at 8-9.

"employment" covered by the act was made even clearer by the addition of language describing "personal service, of whatever nature," etc., as "unlimited by the relationship of master and servant as known to the common law or any other legal relationship." *Id.* at § 11.

### *Appellants and the assessments*

In proceedings below, the appellant-carriers, Swanson Hay, Co. (Swanson), System-TWT Transport (System), and Hatfield Enterprizes, Inc. (Hatfield), appealed unemployment taxes assessed by the Employment Security Department (Department) on the carriers' payments for services to owner-operators. They participated in evidentiary or summary judgment proceedings before an administrative law judge (ALJ) and filed petitions for review of the ALJ's adverse determinations by the Department's commissioner (Commissioner). The Commissioner entered modified findings and conclusions but affirmed determinations adverse to the carriers.

There are some differences in the three carriers' operations and audit history. System was identified for audit through the work of an "underground economy unit" of the Department and was originally assessed $264,057.40 in taxes for the period beginning in the second quarter of 2007 and including years 2008 and 2009. 1 AR(ST) at 4,[3] ¶ 7; 3

---

[3] We identify volumes of the administrative record involved by the volume number, followed by "AR," and followed by a parenthetical identification of the case— SH, ST and H for the Swanson, System, and Hatfield appeals, respectively.

8

AR(ST) at 185-86, 183, 222-23; 2 AR(ST) at 350. During that time frame, System treated roughly 380 company drivers as employees, reporting and paying unemployment insurance taxes. 2 AR(ST) at 320, ¶ 5; Br. of Appellant System at 5. But it contracted with more than 250 owner-operators that it treated as exempt from operation of the tax. *Id.* It engaged in several appeals of its assessment, contesting both the amount and liability for the tax, but ultimately stipulated to an assessment value of $58,300.99 should its challenge to liability fail. 1 AR(ST) at 5, ¶ 11; 2 AR(ST) at 350-51.

Swanson and Hatfield are smaller operators. Swanson was originally found by the Department to have misclassified 12 contractors as not in employment and was assessed $36,070.32 for the period 2009, 2010, and the first two quarters of 2011. 2 AR(SH) at 235, ¶¶ 4.1, 4.5. On appeal, the Department agreed to modify the assessment to treat only 11 of the contractors as misclassified. 2 AR(SH) at 235, ¶ 4.7. The order and notice of assessment was later remanded to reduce the assessment to account for the contractor treated as exempt. *Id.* at 280.

Hatfield was found by the Department to have misclassified 15 contractors as not in employment and was assessed taxes and penalties of $13,616.53 for eight calendar quarters falling within the period January 2009 through June 2011. 4 AR(H) at 1140, ¶ 4.1. On appeal, the ALJ ordered that the assessment be reduced to 30 percent of that amount to account for the fact that the Department relied on payment amounts

9

approximately 70 percent of which were for equipment rather than driving services.

*Id.* at 1144, ¶ 5.8. The reduction was affirmed by the Commissioner. *Id.* at 1201.

Differences in the carriers and their procedural histories are mostly

inconsequential on appeal. They are discussed where relevant.

## ANALYSIS

GROUNDS RELIED ON FOR JUDICIAL REVIEW AND STANDARDS OF REVIEW

Judicial review of agency action is governed by the Administrative Procedure Act

(APA), Title 34 RCW. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494

(1993). We apply the standards of the APA directly to the record before the agency and

in employment security appeals we review the decision of the Commissioner, not the

underlying decision of the ALJ or the decision of the superior court. *Id.*; *Verizon Nw.,

Inc., v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). The

Commissioner's decision is deemed prima facie correct and the burden of demonstrating

otherwise is on the party attacking it. RCW 50.32.150.

The APA authorizes courts to grant relief from an agency order in an adjudicative

proceeding in nine instances, five of which were relied on in petitions for judicial review

filed by one or more of the carriers:

- The order or the statute on which it is based is in violation of constitutional provisions;
- The agency engaged in unlawful procedure or decision-making process, or failed to follow a prescribed procedure;

10

- The agency erroneously interpreted or applied the law;
- The agency did not decide all issues requiring resolution by the agency; and
- The order is arbitrary or capricious.

RCW 34.05.570(3)(a), (c), (d), (f), and (i). Clerk's Papers (CP) at 4, 24, 98, 318.

Errors of law are reviewed de novo. *Inland Empire Distrib. Sys., Inc. v. Utils. & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624 (1989). An agency's decision is arbitrary and capricious if it is "willfully unreasonable, without consideration and in disregard of facts or circumstances." *W. Ports Transp., Inc. v. Emp't Sec. Dep't*, 110 Wn. App. 440, 450, 41 P.3d 510 (2002).

## ISSUE ONE: FEDERAL PREEMPTION

System makes a threshold argument that even if the Employment Security Act (ESA)[4], would otherwise apply to its payments for the services of owner-operators, the Department's assessments are preempted by federal law. Hatfield joins in all of System's arguments. Br. of Appellant Hatfield at 9. The Department responds that Division One of this court already held that the ESA is not federally preempted in *Western Ports*, 110 Wn. App. at 457.

In its final decisions in the System and Hatfield appeals, the Commissioner, "mindful of [his] limited authority as a quasi-judicial body" discussed case law from

---

[4] What had formerly been entitled the Unemployment Compensation Act was renamed the Employment Security Act in 1953. LAWS OF 1953, 1st Ex. Sess., ch. 8, § 14.

11

other jurisdictions dealing with the federal preemption issue but ultimately concluded that his was not the appropriate forum to decide the constitutional issue, except insofar as he would apply *Western Ports. E.g.*, 4 AR(H) at 1191. He correctly observed that the Commissioner's Review Office, being an office within the executive branch, lacks the authority or jurisdiction to determine whether the laws it administers are constitutional; only the courts have that power. *Id.* (citing RCW 50.12.010 and .020; *Bare v. Gorton*, 84 Wn.2d 380, 383, 526 P.2d 379 (1974)). At the same time, he recognized that on judicial review, the superior and appellate courts may consider and rule on the constitutionality of an agency order. *Id.* (citing RCW 34.05.570(3)(a)). He found that the record had been adequately developed at the administrative level to enable judicial review. *Id.* at 1192.

To assess the relevance of *Western Ports*, we begin by identifying the preemption arguments that System advances. It first relies on an express preemption provision that System argues was not considered in *Western Ports*. Its second argument relies on language from federal leasing regulations that were considered in *Western Ports* and found not to preempt state law, but System argues we should reject *Western Ports'* conclusion in light of later, persuasive authority.

## A. EXPRESS PREEMPTION

In 1994, seeking to preempt state trucking regulation, Congress adopted the Federal Aviation Administration Authorization Act of 1994 (FAAAA), Pub. L. No. 103-305, § 601, 108 Stat. 1605-06; *see also* ICC Termination Act of 1995, Pub. L. No. 104-

12

88, § 14501, 109 Stat. 899. Its express rule of preemption, which is subject to exceptions

and exclusions not relevant here, provides:

> [A] State, political subdivision of a State, or political authority of 2 or more
> States may not enact or enforce a law, regulation, or other provision having
> the force and effect of law related to a price, route, or service of any motor
> carrier . . . or any motor private carrier, broker, or freight forwarder with
> respect to the transportation of property.

49 U.S.C. § 14501(c)(1).

In adopting the preemptive language "related to a price, route, or service,"

Congress copied language of the preemptive clause of the Airline Deregulation Act of

1978 (ADA), Pub. L. No 95-504, 92 Stat. 1705, in order to ensure application of the

broad interpretation of that preemption provision adopted by the United States Supreme

Court in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S. Ct. 2031, 119 L. Ed.

2d 157 (1992). The Supreme Court held in *Morales* that the "related to" preemption

provided by the ADA preempted all "[s]tate enforcement actions having a connection

with, or reference to airline 'rates, routes, or services.'" *Id.* at 384 (alteration in original)

(quoting 49 U.S.C. App. § 1305(a)(1)). It rejected states' arguments that their laws of

general applicability were immune from preemption. Pointing to its earlier holding in an

ERISA[5] case (ERISA also employs the same preemptive language), the Court held that

"'[a] state law may "relate to" a benefit plan, and thereby be pre-empted, even if the law

---

[5] Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§
1001-1461.

13

is not specifically designed to affect such plans, or the effect is only indirect.'" *Id.* at 386

(alteration in original) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139,

111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)). In a critical limitation on its holding, the

Court recognized that "'[s]ome state actions may affect [airline fares] in too tenuous,

remote, or peripheral a manner' to have pre-emptive effect." *Id.* at 390 (alterations in

original) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21, 103 S. Ct. 2890,

77 L. Ed. 2d 490 (1983)).

The carriers in this case argue that imposing unemployment insurance taxation on

their use of owner-operators has a significant impact rather than a tenuous, remote, or

peripheral impact on their prices, routes, and services. They contend that it "effective[ly]

eliminat[es] . . . the owner/operator business model" that has been long relied upon for "a

flexible supply of equipment in an industry with erratic demand." Br. of Appellant

System at 1-2.

### 1. *Western Ports* did not address express preemption

With System's first challenge in mind, we turn to *Western Ports*. It arose not from

a Department audit, but from an application for unemployment benefits by Rick

Marshall, an owner-operator whose independent contractor agreement with Western

Ports, a trucking firm, had been terminated by the firm. The Department denied Mr.

Marshall's application for benefits based on Western Port's contention that he was an

independent contractor exempt from coverage under RCW 50.04.140. The principal

14

focus of this court's decision on appeal was whether Western Ports proved the first, "freedom from control" requirement for the exemption. *W. Ports*, 110 Wn. App. at 452-59.

But Western Ports also argued that federal transportation law preempted state employment security law because it both permitted and heavily regulated owner-operator lease arrangements like Mr. Marshall's. *Id.* at 454. This court analyzed that argument as an issue of implied "field" preemption—one of three ways federal law can be found to preempt state law, the other two being express preemption or where state law would conflict with federal law. *Estate of Becker v. Avco Corp.*, 187 Wn.2d 615, 622, 387 P.3d 1066 (2017). Field preemption can be found from federal regulation so pervasive it supports the inference that Congress left no room for state supplementation, where the federal interest is so dominant it can be assumed to be exclusive, or where the federal objective and regulation reveals the same purpose as the state purpose. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983).

In analyzing the field preemption argument, *Western Ports* considered 49 U.S.C. § 14102, which authorizes the Secretary of the federal Department of Transportation to regulate the leasing of motor vehicles used in interstate commerce, and the detailed federal leasing regulations adopted thereunder. 110 Wn. App. at 454-57, 455 n.2. It "decline[d] to infer" from them that Congress intended to supplant state law, given that

15

"[n]owhere . . . has Congress even mentioned state employment law" and federal transportation law and state unemployment insurance law "have very different policy objectives." *Id.* at 457. Only once in *Western Ports* did the court mention the FAAAA's express preemption provision, and that was to point out that when Congress wanted to preempt state law, it did so "expressly, clearly, and understandably." *Id.*

*Western Ports* contains no analysis of whether imposing state unemployment insurance taxes on Western Port's payment for owner-operator services related to its prices, routes, or services. While the decision is relevant and persuasive as to other issues presented in this appeal, it simply did not address the first, express preemption issue that is raised by these carriers.[6]

> ## 2. The carriers' express preemption argument proceeds on a theory that Title 50's broad definition of "employment" will be applied in other contexts, a legal premise we reject

The carriers largely rely on a series of state and federal court decisions that have found a portion of Massachusetts's independent contractor statute to be preempted by the FAAAA as applied to motor carriers' payment for owner-operator services. The carriers' briefs even echo language from one of those decisions, *Sanchez v. Lasership, Inc.*, 937 F.

---

[6] The Department points out that Division Three of the Colorado Court of Appeals read *Western Ports* as rejecting the "argument that the imposition of unemployment tax liability under [Washington's] scheme against a carrier concerning a truck driver was preempted by federal law, *including 49 U.S.C. § 14501(c)(1)*." *SZL, Inc. v. Indus. Claim Appeals Office*, 254 P.3d 1180, 1188 (Colo. App. 2011) (emphasis added). We respectfully disagree with the Colorado court's analysis of the decision.

Supp. 2d 730, 736 (E.D. Va. 2013), which characterized the Massachusetts law as "an unprecedented change in independent contractor law that dictates an end to independent contractor carriers in Massachusetts and imposes an anticompetitive, government-driven mandate that motor carriers change their business models to avoid liability under the statute."

The Massachusetts law—chapter 149, section 148B of the Massachusetts General Laws—is different from Washington law in important respects. It mandates "employee" classification for purposes of multiple state laws, more significantly affecting motor carriers. The mandated classification applies at a minimum to chapters 149 and 151 of the Massachusetts General Laws, which deal with workmen's compensation and minimum fair wages. *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 433 (1st Cir. 2016). Under those laws, an "employer" must provide benefits to employees that include days off, parental leave, work-break benefits, a minimum wage, and reimbursement of all out-of-pocket expenses incurred for the benefit of the employer regardless of what the parties' agreement would otherwise provide. *Id.*

By contrast, chapter 50.04 RCW defines employment and identifies its exemptions solely for unemployment insurance tax purposes. As observed in *Western Ports*, "an individual may be both an independent contractor for some purposes, and engaged in 'employment' for purposes of Washington's exceedingly broad definition of covered employment." 110 Wn. App. at 458.

17

System asks us to reject that conclusion of *Western Ports* and the Department's position that Title 50's definitions and exemptions apply only to unemployment insurance taxes, calling them "unrealistic." Br. of Appellant System at 25. It cites to evidence that the Department participated in an underground economy task force "whose thrust was to subject carriers to state regulation for a variety of other agency purposes," and to an Obama administration employee misclassification initiative. Br. of Appellant System at 25 n.35. Our own reading supports the carriers' contention that there is advocacy from some quarters for extending the narrow "ABC" criteria for independent contractor status in the unemployment compensation context to other worker protections. *See, e.g.*, Jennifer Pinsof, *A New Take on an Old Problem: Employee Misclassification in the Modern Gig-Economy*, 22 MICH. TELECOMM. & TECH. L. REV. 341 (2016); Anna Deknatel & Lauren Hoff-Downing, *ABC on the Books and in the Courts: An Analysis of Recent Independent Contractor and Misclassification Statutes*, 18 U. PA. J.L. & SOC. CHANGE 53 (2015). But there is opposition advocacy as well, as evidenced by the participation in this appeal of American Trucking Associations, Inc. as amicus curiae in support of System.

The scope of Title 50's broad definition of "employment" presents an issue of law for this court, not an issue for political speculation. Under the law as it presently stands, the definition and exemptions apply only to the imposition of unemployment insurance

18

taxes.[7] We reject as legally unsupported the argument that assessment of the tax on

carriers' payments for owner-operator services will dictate the end to an historic business

model and force carriers to begin purchasing all of their trucking equipment.[8]

---

[7] Washington's Minimum Wage Act, chapter 49.46 RCW, applies the non-exhaustive factors developed under the Fair Labor Standards Act of 1938 to determine whether the economic reality of the business relationship suggests employee or independent contractor status. *Anfinson v. FedEx Ground Package Sys., Inc.*, 159 Wn. App. 35, 50-51, 52, 244 P.3d 32 (2010), *aff'd*, 174 Wn.2d 851, 281 P.3d 289 (2012).

To determine employer liability for worker injuries under Washington's Industrial Safety and Health Act (WISHA), chapter 49.17 RCW, courts consider whether the employer has retained the right to control the manner in which the work is performed. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 52 P.3d 472 (2002).

The Industrial Insurance Act, Title 51 RCW, definition of "worker" was most recently characterized by this court as including common law employees as well as those independent contractors who "'work[ ] under an independent contract, the essence of which is his or her personal labor.'" *Henry Indus., Inc. v. Dep't of Labor & Indus.*, 195 Wn. App. 593, 604, 381 P.3d 172 (2016) (quoting RCW 51.08.180). Notably, the legislature has specifically exempted commercial motor vehicle owner-operators from the definition since 1982, while taking no similar action under the ESA. LAWS OF 1982, ch. 80, § 1, codified at RCW 51.08.180.

*And see* RCW 49.78.020(4)(a) (defining employee for the purposes of Washington's Family Leave Act, chapter 49.78 RCW, as "a person who has been employed: (i) For at least twelve months by the employer with respect to whom leave is requested under RCW 49.78.220; and (ii) for at least one thousand two hundred fifty hours of service with the employer during the previous twelve-month period" and not as "a person who is employed at a worksite at which the employer as defined in (a) of this subsection employs less than fifty employees if the total number of employees employed by that employer within seventy-five miles of that worksite is less than fifty"). RCW 49.78.010(4)(b)

[8] System argues that the Department failed to present evidence to contradict the carriers' testimony that employment insurance taxation affects routes, prices, or services by forcing carriers to treat owner-operators as employees in all respects and forcing them to purchase all trucking equipment needed for their operations.

Case law holds that empirical evidence of an effect on services or rates is not necessary to demonstrate preemption. Courts may, instead, examine the logical effect

19

### 3. Federal law does not expressly preempt the assessments

Whether federal law preempts state law fundamentally is a question of congressional intent. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990). When "federal law is said to bar state action in fields of traditional state regulation . . . [courts] have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *NY State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)).

Laws of general applicability are usually not preempted merely because they increase a carrier's overall costs. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014). "[G]enerally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they

---

that state regulation will have on the delivery of services or setting of rates. *E.g., Mass. Delivery Ass'n v. Healey*, 117 F. Supp. 3d 86, 91 (D. Mass. 2015) (citing *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 21 (1st Cir. 2014)) and *Overka v. Am. Airlines, Inc.*, 790 F.3d 36, 40-41 (1st Cir.), *cert. denied*, 136 S. Ct. 372 (2015)). Just as examining the logical effect of state regulation can be sufficient to establish that it *is* preempted, examining its logical effect can be sufficient to establish that it is not.

20

provide." *Id.* Such laws are not preempted "even if they raise the overall cost of doing business or require a carrier to re-direct or reroute some equipment." *Id.* (citing *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998)). Laws of general applicability may be preempted where they have such "acute, albeit indirect, economic effects" that states essentially dictate the prices, routes, or services that the federal law intended the market to control. *See Travelers Ins.*, 514 U.S. at 668.

The relevant evidence presented and found by the ALJ is that the ongoing cost of doing business to which the Hatfield will be subjected by the application of Title 50 is a quarterly tax rate that has so far not exceeded 1.14 percent. 1 AR(H) at 79. The record does not reveal the agreed tax rate that led to System's stipulated liability of $58,300.99 for owner-operators over an almost three-year period. But the highest unemployment tax rate presently imposed in Washington is 6 to 6.5 percent of payroll, and not all wages are taxed; they are only taxed up to a cap. RCW 50.29.025; 50.24.010.

System and Hatfield fail to demonstrate that assessment of unemployment insurance taxes on their payment for owner-operator services at the rates provided by Title 50 will have an acute effect that essentially dictates their prices, routes, or services. Instead, they rely unpersuasively on state and federal cases finding the Massachusetts independent contractor act to be preempted. Br. of Appellant System at 19-20 (citing *Sanchez*, 937 F. Supp. 2d 730; *Coakley*, 769 F.3d at 17; *Schwann*, 813 F.3d 429; and

21

*Healey*, 821 F.3d 187). As already discussed, the Massachusetts law has a greater effect on a carrier's operation because it applies to more laws, imposing additional employer liabilities.

In addition, both the federal First Circuit and the Massachusetts Supreme Court have found the Massachusetts law to be preempted only in part, and on the basis of a provision that has no parallel in RCW 50.04.140(1). *Schwann*, 813 F.3d at 438; *Chambers v. RDI Logistics, Inc.*, 476 Mass. 95, 102-03, 65 N.E.3d 1 (2016). Similar to RCW 50.04.140(1), the Massachusetts statute has three conjunctive requirements that must be shown to establish that an individual is an independent contractor under the applicable laws. Its "A" and "C" requirements are similar to the Washington exemption's "freedom from control" and "independently established enterprise" requirements. But Massachusetts' "B" requirement—the one found to be federally preempted—is materially different from the "independent business character or location" requirement of RCW 50.04.140(1)(b).

RCW 50.04.140(1)(b), like the "B" prong of the Social Security Board's 1937 draft bill, requires the party contracting services to show that the "service is either outside the usual course of business for which such service is performed, *or that such service is performed outside of all the places of business of the enterprises for which such service is performed.*" (Emphasis added.) The Commissioner found that System and Hatfield

22

demonstrated that requirement by establishing that the owner-operators perform services using their own trucks, which are outside the carriers' places of business.[9]

By contrast, the second requirement that must be shown under the Massachusetts statute is that "the service is performed outside the usual course of the business of the employer." There is no "outside the place of the carrier's business" alternative. An owner-operator performing delivery service in Massachusetts for a carrier will never satisfy the "B" prong of Massachusetts's exemption. The Massachusetts Supreme Court agreed with the federal First Circuit that "[u]nlike the first and third prongs [of section 148B], prong two 'stands as something of an anomaly' amongst State laws regulating the classification of workers." *Chambers*, 476 Mass. at 103 (quoting *Schwann*, 813 F.3d at 438).

Preemption is an affirmative defense, so the proponent bears the burden of establishing it. *Hill v. Garda CL Nwest, Inc.*, 198 Wn. App. 326, 343, 394 P.3d 390 (2017). System and Hatfield rely on inapplicable case law and present no evidence that the unemployment insurance tax has an acute effect that essentially dictates their prices, routes, or services. They fail to demonstrate express preemption.

_____

[9] Given the carriers' leases, which give them exclusive control of the trucking equipment, the Commissioner did not view this as necessarily a clear call. But he found persuasive a federal neutrality provision, discussed further below, that cautions against assuming that a lessee's federally-required exclusive control precludes an independent contractor relationship. *See, e.g.*, 2 AR(ST) at 375-78 (citing 49 C.F.R. § 376.12(c)(4)). The Department did not cross appeal that decision.

23

## B. FIELD OR CONFLICT PREEMPTION

Alternatively, System argues that field or conflict preemption is required by subsection (4) of 49 C.F.R. § 376.12(c), a provision added to that leasing regulation in 1992 that cautions against its misapplication.

What we refer to as the subsection (4) "neutrality provision" had its genesis in an arguably unintended construction of federal law that sought to "'correct abuses that had arisen under often fly-by-night arrangements'" through which certificated carriers, by leasing equipment from owner-operators, avoided liability for vehicle accidents and left "'thousands of unregulated vehicles on the highways as a menace to safety.'" *Rodriguez v. Ager*, 705 F.2d 1229, 1234 (10th Cir. 1983) (quoting *Simmons v. King*, 478 F.2d 857 (5th Cir. 1973)). Congress responded by enacting legislation under which the Secretary of Transportation could regulate motor carrier leasing arrangements, including by requiring carriers who hold interstate transportation authority to control and be responsible for trucking equipment used in their operations, whether they own it or not. *Edwards v. McElliotts Trucking, LLC*, __ F. Supp. 3d __, 2017 WL 3279168, at *7 (S.D. W.Va. 2017) (citing 49 U.S.C. § 14102(a)(4)).

Among regulations adopted was 49 C.F.R. § 376.12(c)(1), often referred to as the motor carrier "control regulation," which provides:

24

> The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

Consistent with this requirement for continuous carrier control during the lease term, federal regulations require that commercial motor vehicles transporting property in interstate commerce legibly display the name of the operating motor carrier and identify the number of the authority under which the vehicle is being operated. 49 C.F.R. § 390.21(b).

Another regulation in effect until 1986 required that when a carrier terminated a lease and relinquished possession of leased equipment, its relinquishment was not complete until it procured the removal of its name and operating authority identification from the owner-operator's vehicle.[10] Former 49 C.F.R. § 1057.4(d) (1985).

A majority of courts construed these regulations, and later the control regulation standing alone, as creating an irrebuttable presumption of "statutory employment" that trumped state law dealing with the doctrine of respondeat superior in the event an owner-operator negligently caused an accident at a time when the carrier's logo and operating

---

[10] As explained in *Thomas v. Johnson Agri-Trucking*, this regulation was repealed in 1986 and replaced with a regulation that only requires parties to specify in their lease which party is responsible for removing identification devices and how they will be returned to the carrier. 802 F. Supp. 2d 1242, 1246 n.19 (D. Kan. 2011) (citing 49 C.F.R. 376.12(e)).

25

authority number appeared on its vehicle. Even if the facts and circumstances would not support liability of the carrier under state law, the federal regulation was found to dictate liability.

In *Rodriguez*, for example, an owner-operator, David Ager, decided to sell his tractor-trailer to his brother John. David notified the carrier under whose authority he operated of his desire to terminate their lease. 705 F.2d at 1230-31. The carrier sent the necessary paperwork to David, and he signed it. *Id.* He then turned possession of his tractor-trailer over to John, to perform a trip that David had arranged independently, without any involvement or knowledge on the part of the carrier. *Id.* at 1231. Yet the carrier was held liable as a matter of law when John, driving negligently, had a head-on collision with an automobile, killing four members of the Rodriguez family. *Id.* at 1236. At the time of the accident, which occurred within days after David signed the termination paperwork, the carrier's insignia and identifying number had not yet been removed from the sides of David's tractor. *Id.* at 1230. As the Tenth Circuit observed, "[I]t cannot be said that John was driving the truck as an agent of [the carrier]. If . . . liability exists at all it is by virtue of a regulation of the ICC." *Id.* at 1231.

Beginning in the late 1980s, and at the behest of industry trade groups, the Interstate Commerce Commission (ICC) began publishing guidance questioning this interpretation of its regulations as creating a federal basis for liability. *Edwards*, 2017 WL 3279168 at *7. The ICC expressed its view that courts should "decide suits of this

26

nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort . . . law and create carrier liability where none would otherwise exist." *Lease & Interchange of Vehicles*, 3 I.C.C.2d 92, 93 (1986). In 1992, the ICC formally amended its regulations by adding the following subsection (4) to the control regulation:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements.

49 C.F.R. § 376.12(c)(4). System argues that this provision was intended to explain to "confused" state officials what impact federally-mandated requirements had on state law control issues. Br. of Appellant System at 35.

We disagree. Confusion on the part of state officials is not what the ICC was trying to address. It was trying to disabuse courts of the notion that if state common law did not support a carrier's vicarious liability for the negligence of an owner-operator, then ICC's control regulation should be viewed as creating federal-law based vicarious liability. Nothing in the history of the irrebuttable presumption/statutory employee cases suggests that the ICC believed it should—or could—narrow vicarious liability under state

27

law by dictating to states certain evidence of the relationship between the carrier and the owner-operator that they were required to ignore.

To view 49 C.F.R. § 376.12(c)(4) in this way is to claim that it is preemptive, and System does make that claim. It characterizes the provision as "direct[ing the Department of Employment Security] not to utilize federally-mandated lease requirements to establish that owner/operators are System employees." Reply Br. of Appellant System at 15. System argues that the regulation was held to be preemptive in *Remington v. J.B. Hunt Transp., Inc.*, 2016 WL 4975194 (D. Mass. 2016).

*Remington* merely found a narrow conflict-based preemption of the Massachusetts independent contractor act, insofar as that act required a carrier to pay certain owner-operator expenses that federal leasing regulations treated as a matter to be negotiated by the parties. *Id.* at *4-5. As the district court observed, "What is explicitly permitted by federal regulations cannot be forbidden by state law." *Id.* at *4. It held that the Massachusetts act would be preempted "to [the] extent" it conflicted with federal regulations that permitted allocation of expenses. *Id.* at *5.

*Remington* rejected the carriers' argument that the neutrality provision and other federal leasing regulations created field preemption, pointing out that federal regulations were silent as to a number of matters the carriers argued were preempted. It was in this context that the district court cited the neutrality provision as demonstrating that the regulations are "explicitly agnostic on the issue of the carrier-driver relationship,"

28

language that System deems important. *Id.* at \*5. We read that statement as recognizing a "hands off" approach the neutrality provision takes when it comes to deciding matters of state law—not as dictating what states can consider or what they should find.

Courts heeding the neutrality provision in the vehicle accident context from which it arose also do not view it as preempting state law. Where a lease is still in effect and the control regulation is therefore meaningful evidence of the motor carrier's and owner-operator's legal relationship, courts take the carrier's federally-required control into account in deciding vicarious liability. *E.g., Edwards*, 2017 WL 3279168 at \*6 (describing the control regulation as "assum[ing] an additive role in the common law analysis, bolstering Edwards' allegations that [the owner-operator] was a [carrier's] employee but not subsuming the common law standard defining a master-servant relationship"); *Thomas*, 802 F. Supp. 2d at 1249 (viewing the neutrality provision as eliminating the basis for the irrebuttable presumption formerly imposed, but viewing the control regulation as still supporting a rebuttable presumption of agency, which would be analyzed according to state law); *Bays v. Summitt Trucking, LLC*, 691 F. Supp. 2d 725, 731-32 (W.D. Ky. 2010) (since the trucking equipment lease complied with federal regulations and established that a semitractor was under the carrier's exclusive control and possession, there was a rebuttable presumption of agency, with agency and liability to be analyzed according to Kentucky law).

29

System again has the burden of demonstrating federal preemption. It identifies no authority that has treated the neutrality provision as preempting state law distinctions between employees and independent contractors. We adhere to *Western Ports'* holding: federal leasing regulations have not been shown to preempt application of the unemployment insurance tax to payment for owner-operator services.

ISSUE TWO: APPLICATION OF THE INDEPENDENT CONTRACTOR EXEMPTION

The ESA requires an employer to contribute to the compensation fund for workers in its employment unless the employer establishes that the workers are exempt. *Penick*, 82 Wn. App. at 42. The carriers do not dispute that the owner-operators from whom they lease equipment and contract delivery service are in their "employment" as defined by the ESA. They contend that the exemption for services provided by an independent enterprise applies.

Consistent with the legislature's command that Title 50 "be liberally construed for the purpose of reducing involuntary unemployment and the suffering caused thereby," exemptions must be narrowly construed in favor of applying the tax. RCW 50.01.010; *W. Ports*, 110 Wn. App. at 450. Moreover, where taxes are imposed not for revenue only, but to be held in trust for the benefit of a group society is attempting to aid and protect, "courts will scrutinize much more closely . . . where the taxes to be saved jeopardize the protection such groups were intended to have." *Fors Farms, Inc. v. Emp't Sec. Dep't*, 75 Wn.2d 383, 391, 450 P.2d 973 (1969).

30

The Commissioner concluded that System and Swanson failed to demonstrate the first, "freedom from control" requirement, and the third, "independently established enterprise" requirement. In the case of Hatfield, the Department was granted summary judgment on the carrier's failure to demonstrate "freedom from control" and the Commissioner found the record to be inadequate to address the two other requirements for exemption.[11]

## A. FREEDOM FROM DIRECTION OR CONTROL

"The first prong of the exemption test requires determination of whether a worker is free from direction or control during his or her performance of services." *W. Ports*, 110 Wn. App. at 452. "The crucial issue is not whether the employing unit actually controls, but whether it has the right to control the methods and details of the worker's performance." *Id.* (citing *Risher v. Dep't of Labor & Indus.*, 55 Wn.2d 830, 834, 350 P.2d 645 (1960)).

The parties disagree on two matters fundamental to application of the "freedom from control" requirement: they dispute whether the exemption incorporates the common law test for control, making relevant all precedents dealing with the common law of

---

[11] We agree with the Commissioner that the summary judgment record in Hatfield's case is inadequate to determine whether the "B" and "C" prongs of RCW 50.04.140(1) are satisfied by that carrier. We will not further address Hatfield's assignments of error to the Commissioner's refusal to rule in its favor on those issues.

31

agency, not just cases decided under Title 50; and they disagree whether direction and control required by federal regulation should count. We address these matters first.

### 1. 1945 changes to the ESA make clear that it does not incorporate the common law test of control

Between 1939 and June 1945, justices of our Supreme Court engaged in a tug of war over the scope of "employment" for unemployment compensation purposes. In a 1939 decision in *Washington Recorder Publishing Co. v. Ernst*, a majority of the members of Department Two strayed from prior decisions recognizing the uniquely broad definition of "employment" for unemployment compensation purposes and held that "[i]n drafting the statute, the legislators attempted to codify the common law. . . . intend[ing] that the common law test of employment relationship should likewise be the test under the unemployment compensation act." 199 Wash. 176, 195, 91 P.2d 718 (1939).

The Washington Supreme Court appeared to rectify the inconsistency in *Sound Cities Gas & Oil Co., Inc. v. Ryan*, in which it identified six decisions of the court that had construed the scope of "employment" under the ESA and the "ABC" requirements for exemption, stating:

> The opinions of this court, just cited, with the exception of *Washington Recorder Pub. Co. v. Ernst*, *supra*, commit this court to the view that our unemployment compensation act, which is similar to those of the majority of the states where this form of social security obtains, does not confine taxable employment to the relation of master and servant. If the common law relationship of master and servant was to obtain, the legislature would

32

have so stated. . . .

. . . .

"It is unnecessary to determine whether the common law relation of master and servant exists between respondent and [appellants] . . . because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant."

13 Wn.2d 457, 464-65, 125 P.2d 246 (1942) (quoting *McDermott v. State*, 196 Wash. 261, 266, 82 P.2d 568 (1938)).

Within a matter of three years, however, in *Henry Broderick Inc. v. Riley*, 22 Wn.2d 760, 157 P.2d 954 (1945) and *Seattle Aerie No. 1 of Fraternal Order of Eagles v. Commissioner of Unemployment Compensation & Placement*, 23 Wn.2d 167, 168, 160 P.2d 614 (1945), the inconsistency was revived, with the majority holding in both cases that the initial step of determining whether an individual is in "employment" requires an analysis—even before considering exemptions—of whether the parties stand in an independent contractor relationship under common law.

Days after *Seattle Aerie* was filed and months after the filing of *Broderick*, the ESA newly-enacted by the 1945 legislature became effective, with its revised definition of employment, which reads: "personal service, of whatever nature, *unlimited by the relationship of master and servant as known to the common law or any other legal relationship* . . . ." LAWS OF 1945, ch. 35, § 11 (emphasis added).

The Commissioner's position in decisions published as precedential has been that while *Seattle Aerie* remains good law for other purposes, it is no longer good law on the

scope of "employment" for unemployment compensation purposes. In a 1969 case that, like *Seattle Aerie*, involved the taxpayer's engagement of a musical ensemble, the Commissioner observed that *Seattle Aerie* would have been pertinent had the law not changed, but "the modification in the definition of the term 'employment' is most significant [and] makes the decision in the *Eagles* case inapplicable to the present case." *In re Ida's Inn*, No. 68-19-P, 1969 WL 102104, at *5 (Wash. Emp't Sec. Dep't Comm'r Dec. 773, Jan. 13, 1969). In a 1983 case, the Commissioner found the fact situation to be "practically on all fours with the facts found in *Seattle Aerie*" but reached a different outcome because, "Unfortunately for [the appellant,] Mr. Fuller, the statute was amended that same year to make the definition much more inclusive for employment tax purposes." *In re Clayton L. Fuller*, No. 2-07013, 1983 WL 492331, at *2 (Wash. Emp't Sec. Dep't Comm'r Dec. 744, 2d Series Oct. 31, 1983).

In its 1947 decision in *Skrivanich v. Davis*, our Supreme Court recognized that the 1945 act materially modified the language from which the *Broderick* and *Seattle Aerie* courts inferred that determining whether one was in "employment" required deciding whether one was a "servant" working for "wages":

> It is to be noted that in the 1943 act . . . employment meant service "performed for wages or under any contract of hire" *suggesting by that phraseology alone* a relationship of master and servant; whereas, in the 1945 act, upon which the instant case rests, the term "employment" is defined as meaning

34

'. . . personal service, of whatever nature, unlimited by the relationship of master and servant as known to the common law or any other legal relationship, [including service in interstate commerce,] . . . performed for wages or under any contract calling for the performance of personal services.'

It is apparent that the 1945 legislature intended and deliberately concluded to extend the coverage of the 1943 unemployment compensation act and by express language, to preclude any construction that might limit the operation of the act to the relationship of master and servant as known to the common law or any other legal relationship.

29 Wn.2d 150, 158, 186 P.2d 364 (1947) (emphasis added) (some alterations in original).

If the carriers are contending that the common law distinction between servants and independent contractors applies not to the definition of "employment" but to the "freedom from control" requirement for exemption, we disagree on that score as well. The legislature adopted the language of the "freedom from control" requirement suggested by the Social Security Board's draft bill; it did not use the language incorporating the "control" that distinguished servants and independent contractors under Washington common law. At the time, the test in Washington for that purpose was "whether or not the employer retained the right, or had the right under the contract, to control the mode or manner in which the work was to be done." *Sills v. Sorenson*, 192 Wash. 318, 324, 73 P.2d 798 (1937) and cases cited therein. The statutory "freedom from control" exemption requirement adopted in 1937 and reenacted in 1945 is forward-looking and broader ("has been and will continue to be free from control or direction over

35

the performance of such service") and emphasizes that the freedom from control must be "both under [the contractor's] contract of service and in fact." RCW 50.04.140(1)(a).

We agree that since the legislature did not define the word "control" in the ESA, cases from other contexts can be consulted for the meaning of that word alone. But we agree with the Department that when it comes to applying the "free[dom] from control or direction over the performance of services" required for exemption under RCW 50.04.140(1), it is cases applying Title 50, not common law cases, that are controlling.

## 2. We will not disregard control or direction because it is required in a regulated industry

The carriers and amici contend that in applying the "freedom from control" exemption, we should not consider control or direction that the carriers are required to exercise under federal regulations. They argue that carrier compliance with federal lease regulations is not "control" by the carriers, it is control by the federal government. Br. of Appellant System at 33-34. Or as amici puts it, quoting a National Labor Relations Act[12] case, "'[i]t is *the law* that controls the driver.'" Br. of Amici Curiae at 13 (alteration in original) (quoting *N. Am. Van Lines, Inc. v. Nat'l Labor Relations Bd.*, 276 U.S. App. D.C. 158, 869 F.2d 596, 599 (1989)). The parties recognize that *Western Ports* addressed this same argument. In *Western Ports*, this court agreed that "a number of the controls exerted by Western Ports . . . are dictated by federal regulations," but stated, "Even so,

---

[12] 29 U.S.C. §§ 151-169.

RCW 50.40.100 suggests that the Department properly can consider such federally mandated controls in applying the statutory test for exemption." 110 Wn. App. at 453. Amici argues that this language was dicta. The Department argues it is stare decisis. System argues that *Western Ports'* reasoning has "been rejected by pervasive and more current authority." Reply Br. of Appellant System at 16.

### a. *Western Ports'* holding was not dicta, but we believe the issue merits closer review

When a court unquestionably issues a holding based on multiple grounds, none of the grounds are dicta. *See In re Pers. Restraint of Heidari*, 174 Wn.2d 288, 293, 274 P.3d 366 (2012). Language suggesting that a court is speaking hypothetically can suggest that a statement is dicta, but in *Western Ports*, the court addressed the argument that federal control did not count first, and addressed it directly, before going on to explain that it would reach the same result "even if" it ignored federal control. 110 Wn. App. at 454. This reflects multiple grounds for the decision, not dicta.

As for the issue of whether we are required to apply the doctrine of stare decisis and our Supreme Court's "incorrect and harmful" standard before disagreeing with Division One, there is room for debate on that issue. This author has concluded that we are not. *See* the two concurring opinions in *In re Personal Restraint of Arnold*, 198 Wn. App. 842, 851-55, 396 P.3d 375 (2017). At a minimum, "it is not inappropriate for this

37

court to consider whether a previous opinion is incorrect and harmful in deciding whether or not to follow it." *Id.* at 850 (Siddoway, J., concurring).

*Western Ports* reasoned that by including service in interstate commerce in the statutory definition of "employment," RCW 50.40.100 suggests that the Department properly can consider federally mandated controls. Since the reference to interstate commerce is only vaguely suggestive and System directs us to more recent case law, we believe the parties' arguments on this issue warrant closer review.

> ### b. Federally mandated control is relevant and must be considered under the plain language of RCW 50.04.140(1)(a)

To determine whether federally mandated control should be ignored, we begin with the language of this first requirement for the exemption. RCW 50.04.140(1)(a) says that it must be "shown . . . that . . . [s]uch individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact."

Our fundamental objective in construing a statute is to ascertain and carry out the legislature's intent. *Arborwood Idaho, LLC v. City of Kennewick*, 151 Wn.2d 359, 367, 89 P.3d 217 (2004). The language at issue must be evaluated in the context of the entire statute. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149, 3 P.3d 741 (2000). Where the statute's meaning is plain on its face, we give effect to that meaning as expressing the legislative intent. *Arborwood*, 151 Wn.2d at 367. At the same time, we

avoid interpretations that are "'[s]trained, unlikely, or unrealistic.'" *Simpson Inv.*, 141 Wn.2d at 149 (quoting *Bour v. Johnson*, 122 Wn.2d 829, 835, 864 P.2d 380 (1993)).

Although the exemption requirement does not say that the control or direction to be assessed is control or direction exercised by the employer, it is implicit and necessary to a reasonable reading of the requirement that the employer exercise the control or direction. The other two requirements of the exemption look to the employee's relationship with the employer. The freedom from control requirement speaks of control under the "contract of service," meaning the contract with the employer. RCW 50.04.140(1)(a). And control or direction over the service provider that is exercised by a third party with no involvement by the employer has no relevance to the employee's economic insecurity.

But there is no textual basis for concluding that the control exercised by the employer must be control it has freely chosen to exercise, as opposed to control it is required to exercise by law.

The case law on which System and amici rely does not persuade us to read such a limitation into the Washington exemption requirement. To begin with, the cases are from other jurisdictions, and almost all arise in the distinguishable contexts of worker's compensation or the duty to collectively bargain under the National Labor Relations Act. The Washington Legislature has already approached owner-operators differently for worker's compensation and unemployment compensation purposes, exempting them as

39

workers for the first purpose but not the second.[13] And identifying individuals with whom a business must collectively bargain is fundamentally different from identifying individuals whose capped wages a business must multiply by .065 or less and contribute to an unemployment benefit fund. We could reject the case law on which System and amici rely as unhelpful on these bases alone.

But we also find the reasoning unpersuasive. Take the three out-of-state decisions dealing with worker's compensation on which amici relies. *Wilkinson v. Palmetto State Transportation Co.*, 382 S.C. 295, 676 S.E.2d 700 (2009) and *Hernandez v. Triple Ell Transport, Inc.*, 145 Idaho 37, 175 P.3d 199 (2007), rely on the reasoning announced in the first of the three, *Universal Am-Can, Ltd. v. Workers' Compensation Appeal Board*, 762 A.2d 328 (Pa. 2000). In that case, the Pennsylvania court held, "Because a motor carrier has no ability to negotiate aspects of the operation of leased equipment that are regulated, these factors may not be considered in resolving whether an owner-operator is an independent contractor or employee." *Id.* at 334; *and see Wilkinson*, 676 S.E.2d at 703, *and Hernandez*, 175 P.3d at 205.

This reasoning is too simplistic to resolve the issue presented to us. The implication is that only freely chosen employer control counts. But before that conclusion can be drawn, consideration must be given to why the legislature identified

---

[13] *See* note 7, *supra.*

control as a factor in imposing the unemployment insurance tax. Is it because freely chosen control is disfavored, and should be penalized? Or is it because the fact that a service provider is controlled or directed by the employer is one indicator of dependence? The purpose of the "ABC" requirements has been said to be to distinguish between "the person who pursues an established business of his own, who is not ordinarily dependent upon a particular business relationship with another for his economic survival, and other persons who are dependent upon the continuance of their relationship with a principal for their economic livelihood." Asia, *supra* at 87. Control may be an indicator of dependence whether control is imposed by Congress or by the employer.

We see no room in the plain language of the "freedom from control" requirement for excluding federally mandated control exercised by an employer, and we find nothing strained or unrealistic about including that control in the analysis. If we viewed the statute is ambiguous, we would give substantial weight to its interpretation by the Department, as the agency that administers the statute. *Dep't of Revenue v. Bi-Mor, Inc.*, 171 Wn. App. 197, 202, 286 P.3d 417 (2012). We agree with Division One's conclusion in *Western Ports* that federally mandated control counts.

41

### 3. The carriers have not demonstrated the required freedom from control and direction

System and Swanson did not assign error to any of the Commissioner's findings of fact.[14] They are verities on appeal. *Kittitas County v. Kittitas County Conservation Coal.*, 176 Wn. App. 38, 55, 308 P.3d 745 (2013). At issue with respect to those appellants is whether the Commissioner's findings support its conclusion that they failed to demonstrate that the owner-operators whom they paid for services were free from control and direction.

As for Hatfield, the Commissioner determined as a matter of summary judgment that it failed to demonstrate the "freedom from control" requirement for exemption. We review that decision de novo, viewing the evidence in the light most favorable to Hatfield, as the nonmoving party. *Verizon Nw.*, 164 Wn.2d at 916.

The following evidence of the carriers' relationship with their owner-operators during the audit periods is undisputed:

---

[14] System and Swanson complain that this is a hypertechnical shortcoming and that we should glean their challenges to factual findings from their petitions in the trial court and their briefing on appeal. Extensive numbered findings were made following the administrative hearings and were almost entirely adopted by the Commissioner. Those findings are the intended and judicially economical way to identify evidence sufficiency challenges. RAP 10.3(g); *see* RAP 10.3(h). Moreover, none of the carriers identified RCW 34.05.570(3)(e) (insufficient evidence) as a basis for seeking judicial review.

- Swanson's, System's, and Hatfield's lease agreements with their owner-operators gave the carriers exclusive control and possession of their owner-operators' trucking equipment.

- The owner-operators' services were performed under the carriers' operating authority. Swanson's and Hatfield's agreements required owner-operators to mark their equipment with the carrier's name, address, and operating authority number.

- Swanson and System required their owner-operators to notify the carrier of any accident.

- Swanson required owner-operators to provide photos of freight they hauled when requested.

- Swanson provided owner-operators with medical and dental coverage, which would be fraudulent if they were independent contractors.

- Swanson allowed owner-operators to store equipment at its premises if they wanted to, and approximately half of the owner-operators did.

- Swanson was responsible for overload violations.

- Swanson required owner-operators to file daily logs, daily vehicle condition reports, scale tickets, toll receipts, delivery receipts, maintenance reports and records, and all other reports, documents, and data required by law; System likewise required owner-operators to submit delivery paperwork to it. Hatfield more generally required owner-

43

operators to comply with all rules and regulations applicable to their operations and it reserved the right to immediately terminate their lease in the event of a violation.

- Swanson billed customers and paid 88 percent to the owner-operators less deductions such as fuel charged by owner-operator to Swanson and insurance purchased through Swanson. System and Hatfield likewise billed customers and paid the owner-operators for transporting their customers' freight.

- If a customer failed to pay, Swanson would still pay the owner-operator unless the failure to pay was caused by the conduct of the owner-operator; System similarly paid the owner-operator whether or not its client paid it.

- While owner-operators could find their own loads on return trips, they had to get Swanson's permission to accept the load and Swanson would do the billing.

- System's contract with its owner-operators required all drivers to meet its minimum qualifications, gave System the right to disqualify any driver it found unsafe or unqualified, required compliance with its drug and alcohol policy including random testing, required the owner-operators to operate the equipment in compliance with System's other rules and regulations, and gave it the right to immediately terminate the agreement if the owner-operator committed an act of misconduct detrimental to System's business.

- System's contract with its owner-operators prohibited them, without System's written consent, from assigning or subcontracting to another party or trip leasing the equipment to other carriers.

- System prohibited owner-operators from transporting a third person without its prior approval and its contract provided that it could take physical possession of the owner-operators' equipment at its discretion.

- System's contract included nondisclosure protections for customer information that survived termination of its agreement with an owner-operator.

- None of Hatfield's owner-operators carried their own insurance, although they were responsible for the cost of cargo and liability insurance borne by Hatfield.

- Hatfield held all licenses and fuel permits.

- Hatfield's owner-operators were required to maintain the leased equipment in good repair, mechanical condition, running order and appearance, including by washing and cleaning it as frequently as required to maintain a good public image.

- Hatfield retained the right to discuss and recommend actions against an owner-operator's employees or agents in the event they damaged Hatfield's customer relations through their negligence. It also retained the right to take possession of the owner-operator's equipment and cargo, and complete a shipment itself if it believed the owner-operator had breached the contract in manner creating liability for Hatfield.

45

- Hatfield required owner-operators to have a safety inspection of the leased equipment at least once every 90 days at a federally approved inspection station.

The carriers bear the burden of showing qualification for the exemption from unemployment insurance taxation. *Group Health Coop. of Puget Sound, Inc. v. Wash. State Tax Comm'n*, 72 Wn.2d 422, 429, 433 P.2d 201 (1967). Their terms of agreement and practice with owner-operators support the Commissioner's conclusion (including as a matter of law, in Hatfield's case) that the carriers failed to demonstrate that their owner-operators have been and will continue to be free from control or direction in performing services, both under their contract of service and in fact. The nature of the relationship is similar to that presented in *Western Ports*, where the owner-operator was found to be an employee for the purposes of unemployment insurance taxation despite the fact that he "owned his own truck, paid for his own truck repairs, fuel and insurance, chose his own routes and could have hired another driver to operate his equipment." *W. Ports*, 110 Wn. App. at 453.

## B. INDEPENDENTLY ESTABLISHED BUSINESS

The Commissioner's decision that the exemption provided by RCW 50.04.140(1) did not apply to Swanson or System was independently supported by his conclusion that they did not demonstrate the third requirement for the exemption: that the owner-operators were "customarily engaged in an independently established trade, occupation, profession, or business, of the same nature as that involved in the contract of service"

46

with the alleged employer. This element may be satisfied by proof of "'an enterprise created and existing separate and apart from the relationship with the particular employer, an enterprise that will survive the termination of that relationship.'" *Jerome v. Emp't Sec. Dep't*, 69 Wn. App. 810, 815, 850 P.2d 1345 (1993) (quoting *Schuffenhauer v. Dep't of Emp't Sec.*, 86 Wn.2d 233, 238, 543 P.2d 343 (1975)).

> The following factors provide indicia of an independently established business: (1) worker has separate office or place of business outside of the home; (2) worker has investment in the business; (3) worker provides equipment and supplies needed for the job; (4) the alleged employer fails to provide protection from risk of injury or non-payment; (5) worker works for others and has individual business cards; (6) worker is registered as independent business with state; and (7) worker is able to continue in business even if relationship with alleged employer is terminated.

*Penick*, 82 Wn. App. at 44. The most important factor in determining whether an individual is independently engaged is the seventh: the ability to continue in business even if the relationship with the alleged employer is terminated. *Affordable Cabs, Inc. v. Emp't Sec. Dep't*, 124 Wn. App. 361, 371-72, 101 P.3d 440 (2004) (citing *All-State Constr. Co. v. Gordon*, 70 Wn.2d 657, 666, 425 P.2d 16 (1967)).

The Commissioner recognized that the first, second, and third factors weighed in favor of the owner-operators' independence since they work in their trucks, outside their home; have a substantial investment in their trucking equipment; and provide other supplies needed for the transportation of goods. He also recognized that some, but not all of the owner-operators had registered businesses in the State of Washington. But other

47

factors were absent. The most significant to the Commissioner was that the individuals engaged as owner-operators by Swanson and System did not have their own operating authority and had not worked for others. The Commissioner characterized holding one's own operating authority as a "paramount" factor in determining whether the owner-operators had independent enterprises. 2 AR(SH) at 279.

Both carriers argue that it is actually against federal law for an owner-operator to have his or her own operating authority and haul goods for a carrier. But this is semantics. A truck owner working as an owner-operator can apply for and acquire operating authority. He or she just won't be able to operate as an owner-operator under that authority, because when he or she leases equipment and works as an owner-operator, federal law requires the service to be performed under the lessee-carrier's authority. The truck owner can still have and hold operating authority in reserve. The Commissioner's point, and a legitimate one, is that if the truck owner's lease ends, he or she will have more entrepreneurial options by holding his or her own operating authority.

The carriers vigorously disagree with the Commissioner's treatment of independent operating authority as a paramount factor. There is conflicting authority from other jurisdictions as to its importance. *Compare Stafford Trucking, Inc. v. Dep't of Indus., Labor & Human Relations*, 102 Wis. 2d 256, 264, 306 N.W.2d 79 (Wis. Ct. App. 1981) (possessing operating authority is an important indicator of an independently established business), *with W. Home Transp., Inc. v. Idaho Dep't of Labor*, 155 Idaho

950, 953, 318 P.3d 940 (2014) (if the individual's business is to operate as an owner-operator, then possessing operating authority is "completely inconsequential and irrelevant").

The carriers' own evidence and argument suggests that having operating authority is relevant. As the carriers tell us, the reason for the independent operator business model in the trucking industry is "[b]ecause demand in the contemporary American trucking industry fluctuates so dramatically," and owner-operators "provide carriers . . . with a flexible supply of trucking equipment." Br. of Appellant System at 3-4. The obvious corollary is that in periods of dramatically reduced demand, owner-operators go unused. Perhaps in some future case, a carrier will prove that despite dramatically reduced demand, an owner-operator whose services are no longer needed by his or her primary carrier will be needed by other carriers. No such evidence was presented here. None of the owner-operators had worked for more than one carrier.

In Swanson's case, six of the seven disputed owner-operators had registered businesses. However, of the six owner-operators with registered businesses, Swanson contracted with two of them in their capacities as individuals, rather than as businesses. Swanson provided protection for risk of nonpayment of customers. When it comes to the most important factor—the ability to continue in business even if the relationship with the employer is terminated—Swanson presented no evidence that even in a period of dramatic reduced demand, their former owner-operators would be able to continue in

business leasing to others. Its evidence and argument was that "owner-operators make the business decision to 'work exclusively for one carrier to establish and cultivate that particular business relationship.'" Reply Br. of Appellant Swanson at 15 (quoting 7 AR(SH) Ex. Z, at 3).

System presented even less evidence of owner-operator engagement in independent business. Though the owner-operators owned their own trucks, were responsible for the costs of operating them, and maintained their own financial books, System presented no evidence that the owner-operators had registered or licensed businesses or business cards. System also protected the owner-operators from nonpayment.

The Commissioner's findings supported his conclusion that Swanson and System failed to meet their burden of demonstrating that their owner-operators were engaged in independently established businesses.

ISSUE THREE: WHETHER THE ASSESSMENTS SHOULD BE SET ASIDE AS VOID

The final issue raised by System and Hatfield is whether the Department's assessments should be set aside as void, as a result of constitutional violations.[15] System argues that the Department violated procedural due process when its employees failed to

---

[15] Only Swanson sought judicial review on the basis that the Commissioner's decision was arbitrary and capricious. It does not contend on appeal that the Department's assessments are void.

comply with its standards requiring adequate training, independence and professional care, and that it violated substantive due process by targeting the trucking industry and essentially directing auditors to find liability. Hatfield makes arguments similar to System's, and argues in addition that the Department assessed taxes on its equipment despite knowing it was unlawful to do so.

The APA authorizes three types of judicial review of agency action. Under RCW 34.05.570(2), courts are authorized to review the validity of agency rules. Under RCW 34.05.570(3), they are authorized to grant relief from "an agency order in an adjudicative proceeding." All other agency action or inaction is reviewable by courts under RCW 34.05.570(4). Relief for persons aggrieved by the performance of this last category of agency action or inaction is available if the agency's action or inaction is unconstitutional, outside the agency's statutory or other legal authority, arbitrary or capricious, or taken by persons not lawfully entitled to take the action. RCW 34.05.570(4)(c).

Hatfield's and System's petitions for judicial review sought only one type of relief: relief under RCW 34.05.570(3) from the Commissioner's order in the adjudicative appeal. They did not seek relief under RCW 34.05.570(4) for the acts or omissions of

51

department employees engaged in the audits. *See* CP at 98-101, 318-21.[16] The question

on appeal, then, is whether their constitutional rights were violated in the administrative

appeals process.

The only reasoned argument by System and Hatfield as to how conduct of

department employees in the audit process relates to a deprivation of their rights in the

administrative appeals process is that the Commissioner erred by failing to exclude the

Department's evidence. They cite the requirement of the APA that the presiding officer

in an adjudicative proceeding "shall exclude evidence that is excludable on constitutional

or statutory grounds or on the basis of evidentiary privilege recognized in the courts of

this state." RCW 34.05.452(1). They argue that the remedy for the constitutional

violations they assert is the exclusion of unlawfully obtained evidence, citing *Mapp v.

Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), *State v. Miles*, 160

Wn.2d 236, 156 P.3d 864 (2007), *McDaniel v. City of Seattle*, 65 Wn. App. 360, 828 P.2d

---

[16] In a separate action, System, the Washington Trucking Associations, and five other carriers sought money damages from the Department and department employees who had engaged in the complained-of audit conduct, asserting claims for relief under 42 U.S.C. § 1983 and tortious interference with contract. In a decision filed earlier this year, the Supreme Court held that the § 1983 claim was barred by comity and the tortious interference claim was barred by the exclusive remedy provision of the ESA, RCW 50.32.180. *Wash. Trucking Ass'ns v. Emp't Sec. Dep't*, 188 Wn.2d 198, 393 P.3d 761 (2017), *cert. denied*, No. 17-145, 2017 WL 3324734 (U.S. Oct. 2, 2017). In arriving at its decision, our Supreme Court observed that the carriers had an adequate remedy in their ability to appeal the assessments, including to obtain judicial review of challenges that could not be resolved by the ALJ or the commissioner.

81 (1992), and *Barlindal v. City of Bonney Lake*, 84 Wn. App. 135, 925 P.2d 1289

(1996). Br. of Appellant System at 47, n.56.

Even if the carriers could support their arguments for exclusion of the

Department's evidence with proof of a procedural or substantive due process violation by

department employees, the exclusionary rule does not apply in the administrative appeal

of an unemployment insurance tax assessment. The two civil cases the carriers cite do

not help them. In *McDaniel*, this court refused to extend the exclusionary rule to civil

suits that are not quasi-criminal in nature and that do not seek to exact a penalty or

forfeiture. 65 Wn. App. at 366. *Barlindal*, like our Supreme Court's decision in *Deeter*

*v. Smith* before it, merely recognized that in forfeiture proceedings, which are quasi-

criminal in nature, the Fourth Amendment[17] exclusionary rule applies. 84 Wn. App. at

141 (citing *Deeter*, 106 Wn.2d 376, 377-79, 721 P.2d 519 (1986)). As the Court

observed in *Deeter*, "a forfeiture proceeding is quasicriminal if it is intended to impose a

penalty on an individual for a violation of the criminal law." 106 Wn.2d at 378 (citing

*One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700-02, 85 S. Ct. 1246, 14 L.

Ed. 2d 170 (1965)). The appeal of an unemployment insurance tax assessment is not

quasi-criminal. The Commissioner properly concluded that the exclusionary rule did not

apply.

---

[17] U.S. CONST. amend. XIV.

The Department conduct about which System and Hatfield complain also does not amount to a constitutional violation. Addressing procedural due process first, for there to be a procedural due process violation, we must find that the State deprived an individual of a constitutionally protected liberty or property interest. *Smith v. State*, 135 Wn. App. 259, 277, 144 P.3d 331 (2006). The carriers rely on an asserted property interest in a benefit: a right to be audited under the Department's standards requiring adequate training, independence and professional care.[18] But "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)). Such entitlements are "not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577.

---

[18] The Department argues that the audit procedures had no application to Hatfield and also defends most of the conduct of department employees that the carriers claim was improper. Given the two grounds on which we can reject this assignment of error by the carriers, we do not address these additional issues.

54

No Washington statute or regulation mandates the Department's adherence to its audit procedures, let alone in a manner suggesting that a taxpayer entitlement was being created. *See Castle Rock*, 545 U.S. at 764-65 (even a statute mandating certain action by government employees "would not necessarily mean that state law gave *respondent* an *entitlement* to *enforcement* of the mandate. Making the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people."). Internal audit procedures are not law. *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 323, 119 P.3d 825 (2005). No property interest is demonstrated by System and Hatfield.

Turning to System's and Hatfield's substantive due process claims, substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them. *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). It is concerned with respect for those personal immunities that "are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" *Rochin v. California*, 342 U.S. 165, 169, 72 S. Ct. 205, 96 L. Ed. 183 (1952) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S. Ct. 330, 78 L. Ed. 674 (1934)), "or are 'implicit in the concept of ordered liberty,'" *id.* (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 82 L. Ed. 288 (1937)). An agency's decision resulting from a failure to follow its own procedures may be so arbitrary and

55

capricious that it amounts to a violation of substantive due process. *Nieshe v. Concrete Sch. Dist.*, 129 Wn. App. 632, 641, 127 P.3d 713 (2005).

The substantive component of due process, like its procedural component, requires that System and Hatfield establish that they were deprived of life or of a constitutionally protected liberty or property interest. *Id.* & n.17. The inability to make that threshold showing is fatal to a substantive due process claim. *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). It is fatal to the carriers' claims.

Finally, System and Hatfield cite this court's decision in *Washington Trucking Associations v. Employment Security Department* as holding that "[the Employment Security Department's] assessments are invalid if they result from audits that violate [the Department's] own standards." Br. of Appellant System at 46 (citing 192 Wn. App. 621, 647, 369 P.3d 170 (2016), *rev'd*, 188 Wn. 2d 198, 393 P.3d 761 (2017), *cert. denied*, No. 17-145, 2017 WL 3324734 (U.S. Oct. 2, 2017)). Their citation is to a discussion of whether the plaintiffs' § 1983 claims asserted against department employees were barred by the principle of comity because state law provides an adequate remedy. It was in that context that this court observed that the plaintiffs *alleged* that department assessments were invalid if they violated Department audit standards. The court's holding was that the plaintiffs "have the ability to argue [that] before the ALJ," who "has authority to

56

address these arguments." *Id.* at 646-47. No view was expressed that there was any

merit to that allegation by the plaintiffs.

Affirmed.[19]

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, C.J.

_____

[19] Swanson and System both request attorney fees but neither cites authority to support their requests. Their requests are denied. *See* RAP 18.1.